Opinion
WERDEGAR, J.
The City of Los Angeles, like numerous other municipalities in California and elsewhere, regulates the ability of certain employers to summarily replace the workforce upon acquiring a new business. Is such a worker retention ordinance preempted as intruding upon either matters of health and safety already regulated by the state or matters of employee organization and collective bargaining fully occupied by federal law? We conclude it is not. As well, we conclude the challenged ordinance is fully consistent with both the state and federal equal protection clauses. As the Court of Appeal found the ordinance preempted, we reverse.
Factual and Procedural Background
In December 2005, the City of Los Angeles (City) adopted the Grocery Worker Retention Ordinance (Ordinance). (L.A. Ord. No. 177231, adding *187 ch. XVIII, § 181.00 et seq. to L.A. Mun. Code.)[1] For grocery stores of a specific size (15,000 square feet or larger) that undergo a change of ownership, the Ordinance vests current employees with certain individual rights during a 90-day transition period. First, the incumbent owner is to prepare a list of nonmanagerial employees with at least six months’ employment as of the date of transfer in ownership, and the successor employer must hire from that list during the transition period. (L.A. Mun. Code, § 181.02.) Second, during that same period, the hired employees may be discharged only for cause. (Id.., § 181.03, subds. A-C.) Third, at the conclusion of the transition period, the successor employer must prepare a written evaluation of each employee’s performance. The Ordinance does not require that anyone be retained, but if an employee’s performance is satisfactory, the employer must “consider” offering continued employment. (Id., § 181.03, subd. D.) If the workforce is unionized, however, the union and the employer may agree on terms that supersede the Ordinance. (Id., § 181.06.)
Plaintiff California Grocers Association (Grocers) filed a complaint against the City seeking to enjoin enforcement of the Ordinance on the grounds that it was preempted by provisions of the Health and Safety Code, the Labor Code, and federal labor law, and that it violated the equal protection provisions of the state and federal Constitutions. The Los Angeles Alliance for a New Economy, a nonprofit organization, intervened to defend the Ordinance.
After a two-day bench trial, the trial court entered a judgment enjoining enforcement of the Ordinance, declaring it void on two of the four asserted grounds. The court concluded the Ordinance affected health and sanitation standards for retail food establishments, an area fully occupied by state law, and was on that basis preempted, and further concluded the Ordinance violated equal protection because there was no rational basis for its differential treatment of grocery stores smaller than 15,000 square feet or its permitting employers and unions to contract around the Ordinance’s terms.
A divided Court of Appeal affirmed. The majority agreed with the trial court that the California Retail Food Code (Retail Food Code) (Health & Saf. *188 Code, § 113700 et seq.) fully occupied the field of health and sanitation standards for retail food establishments, and the Ordinance had the impermissible purpose and effect of regulating in the same area. It further concluded, contrary to the trial court, that the Ordinance was also preempted by the National Labor Relations Act (NLRA or the Act) (29 U.S.C. § 151 et seq.) because, in the majority’s view, federal labor law guaranteed successor employers the right to pick and choose whom they wished to employ, free of local regulation. The majority did not address the trial court’s further equal protection conclusions. In contrast, the dissent argued that the Ordinance was neither preempted nor inconsistent with equal protection principles.
We granted review to resolve significant preemption and constitutional questions placing into doubt the validity of this and other similar worker retention ordinances throughout the state.
Discussion
I. State Preemption

A. Preemption Principles

Local ordinances and regulations are subordinate to state law. (Cal. Const., art. XI, § 7.) Insofar as a local regulation conflicts with state law, it is preempted and invalid. (O’Connell v. City of Stockton (2007) 41 Cal.4th 1061, 1067 [63 Cal.Rptr.3d 67, 162 P.3d 583]; Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, 897 [16 Cal.Rptr.2d 215, 844 P.2d 534].) “ ‘ “A conflict exists if the local legislation ‘ “duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.” ’ ” [Citations.]’ ” (O’Connell, at p. 1067, quoting Sherwin-Williams, at p. 897; accord, American Financial Services Assn. v. City of Oakland (2005) 34 Cal.4th 1239, 1251 [23 Cal.Rptr.3d 453, 104 P.3d 813].)
Only the last of these bases for conflict, field preemption, is at issue here. “Local legislation enters an area ‘fully occupied’ by general law when the Legislature has expressly manifested its intent to fully occupy the area or when it has impliedly done so in light of recognized indicia of intent.” (Big Creek Lumber Co. v. County of Santa Cruz (2006) 38 Cal.4th 1139, 1150 [45 Cal.Rptr.3d 21, 136 P.3d 821].) Grocers contends the Ordinance impermissibly intrudes into an area the state has, in the Retail Food Code, expressly reserved for itself. (See Health & Saf. Code, § 113705.) Express field preemption turns on a comparative statutory analysis: What field of exclusivity does the state preemption clause define, what subject matter does the local ordinance regulate, and do the two overlap? (See, e.g., Big Creek Lumber, at *189 pp. 1152-1157; Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 748-751 [29 Cal.Rptr.2d 804, 872 P.2d 143].) The burden of proving the existence of such an overlap rests on Grocers, as the party asserting preemption. (Big Creek Lumber, at p. 1149.)
B. Express Preemption
We begin with the language of the preemption clause and the Ordinance. Health and Safety Code section 113705’s definition of the regulatory field it reserves for the state is clear and precise: “Except as provided in Section 113709,[2] it is the intent of the Legislature to occupy the whole field of health and sanitation standards for retail food facilities, and the standards set forth in this part and regulations adopted pursuant to this part shall be exclusive of all local health and sanitation standards relating to retail food facilities.” Thus, the state alone may adopt “health and sanitation standards for retail food facilities.” (Ibid.) The remainder of the statutory scheme demonstrates by way of example the precise scope of exclusive state regulation, comprehensively detailing standards for, e.g., employee training on health matters (id., §§ 113947-113947.3), employee health and hygiene (id., §§ 113949-113978), food transportation, storage, and preparation (id., §§ 113980-114057.1), food display and service (id., §§ 114060-114083), food labeling (id., §§ 114087-114094), the design and sanitizing of food preparation areas and utensils (id., §§ 114095-114185.5), and the design and cleanliness of food facilities (id., §§ 114250-114282).[3]
In contrast, the Ordinance imposes no substantive food safety standards. Its provisions regulate, for certain grocery stores during ownership transitions, how a new owner may select its workforce. (See generally L.A. Mun. Code, §§ 181.02-181.04.) It does not speak to how employees must conduct themselves to ensure sanitation, how food should be handled or transported, how grocery stores should be designed or cleaned, or any of the various other topics for which the Retail Food Code sets out exclusive state standards. The face of the Ordinance thus discloses no incursion into the exclusive realm reserved for the state by Health and Safety Code section 113705; the former regulates employment, not food safety, while the latter regulates food safety, not employment.
*190 In concluding that the Ordinance nevertheless is preempted, the Court of Appeal majority relied on language in the Ordinance’s preamble and statements by City officials indicating the City, in passing the Ordinance, was concerned with promoting health and safety. The preamble notes in part: “The City has an interest in ensuring the welfare of the residents of [Los Angeles] through the maintenance of health and safety standards in grocery establishments. Experienced grocery workers with knowledge of proper sanitation procedures, health regulations, and understanding of the clientele and communities they serve are instrumental in furthering this interest.” (L.A. Mun. Code, § 181.00.) Remarks by members of the city attorney’s office and some city council members during deliberations similarly suggest the promotion of health and safety may have been a City concern.
We may accept for the sake of argument that the promotion of health and safety was one of the City’s purposes in passing the Ordinance. That the Ordinance is preempted does not, however, follow. Purpose alone is not a basis for concluding a local measure is preempted.[4] While we and the Courts of Appeal have occasionally treated an ordinance’s purpose as relevant to state preemption analysis (see, e.g., Lancaster v. Municipal Court (1972) 6 Cal.3d 805, 809-810 [100 Cal.Rptr. 609, 494 P.2d 681]; Bravo Vending v. City of Rancho Mirage (1993) 16 Cal.App.4th 383, 404-09 [20 Cal.Rptr.2d 164]), we have done so in the context of a nuanced inquiry into the ultimate question in determining field preemption: whether the effect of the local ordinance is in fact to regulate in the very field the state has reserved to itself.
Thus, in Cohen v. Board of Supervisors (1985) 40 Cal.3d 277 [219 Cal.Rptr. 467, 707 P.2d 840], we upheld against a preemption challenge a local ordinance requiring a permit to provide an escort service. The state had impliedly occupied the field with respect to the criminalization of prostitution and sexual conduct. (See In re Lane (1962) 58 Cal.2d 99, 103 [22 Cal.Rptr. 857, 372 P.2d 897].) Although the ordinance’s likely purpose was to reduce vice and deter conduct proscribed by the state, this purpose did not support preemption: “An ordinance is not transformed into a statute prohibiting crime simply because the city uses its licensing power to discourage illegitimate activities associated with certain businesses. Most licensing ordinances have a direct impact on the enforcement of state laws which have been enacted to preserve the health, safety and welfare of state and local citizens. This fact does not deprive a municipality of the power to enact them.” (Cohen, at p. 299.) The ordinance in actual effect did not enter the field of criminalizing *191 sexual conduct, but only controlled who might operate an escort service, leaving the regulation of any such conduct to the state; as such, it was not preempted. (Id. at pp. 295-296, 299-300; see also EWAP, Inc. v. City of Los Angeles (1979) 97 Cal.App.3d 179, 191 [158 Cal.Rptr. 579] [upholding an ordinance regulating picture arcades so as to discourage violations of state law, without criminalizing or imposing any new standard for sexual conduct]; cf. Lancaster v. Municipal Court, supra, 6 Cal.3d at pp. 809-810 [concluding an ordinance was preempted where its effect was to criminalize aspects of sexual conduct].)
Similarly, in Bravo Vending v. City of Rancho Mirage, supra, 16 Cal.App.4th 383, a tobacco company challenged a local ordinance forbidding vending machine cigarette sales. The tobacco company contended that, because the ordinance was intended to reduce sales to minors and the state had expressly occupied the field of penal sanctions for sales to minors, the ordinance was preempted. The Court of Appeal found no preemption. While the local ordinance was intended to make less likely violations of the laws against sales to minors, in actual effect it neither expanded upon nor detracted from the state-mandated prohibitions and sanctions for sales. (Id. at p. 412.)
More recently, in Personal Watercraft Coalition v. Marin County Bd. of Supervisors (2002) 100 Cal.App.4th 129 [122 Cal.Rptr.2d 425], the Court of Appeal rejected the argument that, because a municipality had adopted an ordinance banning the use of personal watercraft out of a concern for pollution, the ordinance was preempted by federal law prohibiting the adoption of state and local emission standards for nonroad vehicles. The Court of Appeal correctly recognized that the purpose of the federal preemption provision was only to alleviate the problems that would arise from “a multiplicity of conflicting state and local exhaust emission standards.” (Id. at p. 155.) Consequently, state and local laws were preempted only to the extent they adopted such standards. Laws that simply promoted the same antipollution goals without setting pollution standards were entirely valid. (Ibid.)
These cases are on point here. The Retail Food Code does not preempt all laws that have as their purpose the promotion of food health and safety; it preempts only those that establish “health and sanitation standards” for retail food establishments, so as to ensure uniformity for such facilities. (Health & Saf. Code, § 113705.) The Retail Food Code itself dictates those uniform standards, but does not specify by whom they are to be carried out; as far as state law is concerned, a retail food store may employ whomever it likes, so long as those it employs comply with the state’s standards for distributing food in a safe and healthful manner. For its part, the Ordinance, like the escort service ordinance in Cohen v. Board of Supervisors, supra, 40 Cal.3d 277, regulates only who may be hired to engage in certain *192 work, and though it may have been intended in part to reduce violations of state law by those workers, it does not itself add to or subtract from the state’s uniform standards of conduct for whoever engages in that work. Like the watercraft ordinance in Personal Watercraft Coalition v. Marin County Bd. of Supervisors, supra, 100 Cal.App.4th 129, the Ordinance promotes the same goals as the enactment of a higher governmental authority, but does so without entering the field that enactment preempts, i.e., the setting of specific uniform standards. The trial court erred in concluding that, because the Ordinance arguably was intended to enact “a different approach to ensuring food safety than that crafted by the Legislature,” ipso facto it was preempted.
Grocers argues, purpose aside, that the Ordinance goes beyond issues of worker retention and does impose food sanitation standards. As foundation for this argument, Grocers focuses on the portion of the Retail Food Code that regulates employee training and knowledge. (See Health & Saf. Code, §§ 113947-113947.6.) Health and Safety Code section 113947, subdivision (a) requires “[t]he person in charge and all food employees [to] have adequate knowledge of, and ... be properly trained in, food safety as it relates to their assigned duties.” The Retail Food Code further requires that specified food facilities have either an owner or employee who has received state certification in food safety (see id., §§ 113947.1, subds. (a), (b)(1), 113947.2, 113947.3) or otherwise be able to demonstrate to an enforcement officer that the employees have adequate knowledge of food safety as it relates to their duties (id., § 113947.1, subd. (b)(2)). For facilities that have just opened, gone through a change in ownership, or otherwise lost their certified food safety specialist, the scheme offers a 60-day grace period. (Id., subd. (e).) Grocers contends the Ordinance, too, regulates employee qualifications.
Contrary to Grocers’s argument, this portion of the Retail Food Code and the Ordinance do not overlap. The Retail Food Code establishes standards for what certain employees, particularly one certified owner or supervising food service employee, must know or be taught, but does not regulate who must be hired; the Ordinance regulates the pool of nonsupervising, nonmanagerial employees from which a new owner temporarily must hire, but imposes no standards concerning what the hired employees must know or be taught about food safety. Notably, the Retail Food Code’s required certified food safety specialist is by definition a managerial or supervisorial employee,[5] while the Ordinance by its terms expressly excludes from its *193 scope all such employees[6] and thus does not regulate or restrict in any way an employer’s freedom to hire whomever it chooses to satisfy that position. As such, the Ordinance does not intrude upon the field the state has expressly reserved to itself and is not preempted by state law.
II. Federal Preemption
A. Machinists Preemption Principles
We consider as well whether the Ordinance is preempted by the NLRA, a federal law enacted to protect “the right of employees to organize and bargain collectively.” (29 U.S.C. § 151.) The supremacy clause of the United States Constitution vests Congress with the power to preempt state law. (Viva! Internal Voice for Animals v. Adidas Promotional Retail Operations, Inc. (2007) 41 Cal.4th 929, 935 [63 Cal.Rptr.3d 50, 162 P.3d 569]; see U.S. Const., art. VI, cl. 2.) While Congress may exercise that power by enacting an express preemption provision, the NLRA contains no such provision; indeed, “Congress has not seen fit to lay down even the most general of guides to construction of the Act, as it sometimes does, by saying that its regulation either shall or shall not exclude state action.” (Bethlehem Co. v. State Board (1947) 330 U.S. 767, 771 [91 L.Ed. 1234, 67 S.Ct. 1026].) Instead, Grocers contends the Ordinance is impliedly preempted under the Machinists doctrine. (Machinists v. Wisconsin Emp. Rel. Comm’n (1976) 427 U.S. 132 [49 L.Ed.2d 396, 96 S.Ct. 2548] (Machinists).) Determining whether Machinists preemption extends here requires that we examine its principles in some depth.
In Machinists, supra, 427 U.S. 132, the United States Supreme Court considered whether labor or management self-help (economic pressure tactics such as boycotts, strikes, and lockouts used to extract concessions during the collective bargaining process), although neither protected nor prohibited by the NLRA, might nevertheless be “ ‘deemed privileged against state regulation.’ ” (Machinists, at p. 141.) A union, seeking to pressure an employer to make concessions in negotiations over renewal of an expired collective bargaining agreement, urged its members to refuse all overtime work. A state labor commission, concluding the conduct was neither arguably protected nor arguably prohibited by federal labor law, enjoined the concerted activity as being in violation of state law, and the state supreme court upheld the injunction.
The United States Supreme Court reversed. It explained that even where the NLRA does not address a particular economic weapon, preemption *194 may still apply. “Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether ‘the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act’s processes.’ ” (Machinists, supra, 427 U.S. at pp. 147-148.) Except insofar as the NLRA itself regulates the use of particular economic weapons, Congress intended a “no-fly” zone, with neither states nor the National Labor Relations Board (NLRB) permitted to interfere in the bargaining process by dictating which weapons labor and management might employ in negotiations. “To sanction state regulation of such economic pressure deemed by the federal Act ‘desirabl[y] . . . left for the free play of contending economic forces, ... is not merely [to fill] a gap [by] outlawing] what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available.’ ” (Machinists, at p. 150.)
In subsequent years, the United States Supreme Court has extended Machinists principles to other instances in which, from the text or structure of the NLRA, it could infer Congress intended the subject matter to be free from state or municipal regulation. Thus, in Golden State Transit Corp. v. Los Angeles (1986) 475 U.S. 608, 618 [89 L.Ed.2d 616, 106 S.Ct. 1395], again addressing regulation of economic weapons in the bargaining process, the United States Supreme Court concluded the City of Los Angeles was preempted from conditioning renewal of a taxicab company’s operating license on the company’s settling a labor dispute. The taxi drivers were permitted under the NLRA to strike to pressure the taxi company, and the taxi company was permitted to resist that pressure and seek to outlast the drivers. The city, by requiring the taxi company to settle in order to keep operating, was effectively placing a time limit on the company when none was contemplated, thereby interfering with its use of permitted economic weapons, and was imposing an obligation to agree where the text and legislative history of the NLRA contemplated only an obligation to bargain. (Golden State Transit, at pp. 615-617.)
Most recently, in Chamber of Commerce of United States v. Brown (2008) 554 U.S. 60 [171 L.Ed.2d 264, 128 S.Ct. 2408], the United States Supreme Court concluded California could not prohibit employers who received state funding from using those funds to influence support for or opposition to union organizing. (See Gov. Code, §§ 16645.2, 16645.7.) Reviewing the history of federal labor regulation, the court noted Congress had “expressly preclude[d] regulation of speech about unionization ‘so long as the communications do not contain a “threat of reprisal or force or promise of benefit.” ’ ” (Brown, at p. 68; see 29 U.S.C. § 158(c).) As well, Congress could have included in section 8(a) and (b) of the NLRA (see 29 U.S.C. § 158(a), (b)) further limits on pro- and anti-unionization advocacy; the limits it chose to *195 include could thus be seen as this-much-and-no-more determinations by Congress. Accordingly, state law was preempted. (Brown, at p. 69.)
The foregoing cases each dealt with circumstances where, from the structure of the NLRA, it was evident Congress had spoken to a particular topic and no state interference could be countenanced. A second line of post-Machinists decisions, by contrast, has articulated significant limits on the scope of Machinists preemption arising from the fact the NLRA is a regulation of process, not substance.
The NLRA was enacted “to remedy ‘[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association.’ ” (Metropolitan Life Ins. Co. v. Massachusetts (1985) 471 U.S. 724, 753 [85 L.Ed.2d 728, 105 S.Ct. 2380] (Metropolitan Life), quoting 29 U.S.C. § 151.) “One of the ultimate goals of the Act was the resolution of the problem of ‘depressed] wage rates and the purchasing power of wage earners in industry,’ 29 U.S.C. § 151, and ‘the widening gap between wages and profits,’ 79 Cong. Rec. 2371 (1935) (remarks of Sen. Wagner), thought to be the cause of economic decline and depression.” (Metropolitan Life, at p. 754.) Congress addressed this problem not by directly dictating particular wage levels, but by establishing procedures for employee organization and collective bargaining that, it hoped, would result in fairer negotiations and higher wages. (Ibid.) The resulting law was “concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions.” (Id. at p. 753.)
The United States Supreme Court in Metropolitan Life analyzed whether the process-oriented NLRA was intended to have any effect on local employment laws of general application. A Massachusetts law required that employee health care plans include certain minimum benefits, a subject that otherwise might have been addressed in collective bargaining. Rejecting the argument that Machinists preemption applied, the Supreme Court drew a line between laws that regulate process and those that regulate substance: “No incompatibility exists . . . between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA.” (Metropolitan Life, supra, 471 U.S. at pp. 754-755.) While the NLRA facilitates collective bargaining over the terms of employment, it does not dictate—nor does it preclude states from dictating—any particular substantive terms of employment.
*196 As the Supreme Court further explained, because the NLRA regulates only ' the process of organizing and bargaining, “[flederal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act.” (Metropolitan Life, supra, 471 U.S. at p. 756.) The NLRA operates against the background of the vast tapestry of substantive state regulation of employer-employee relations—the “ ‘backdrop of state law that provided the basis of congressional action.’ ” (Metropolitan Life, at p. 757.) Congress did not intend “to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization.” (Id. at p. 756.) Massachusetts thus could exercise its broad police powers to regulate the terms of employee health benefits without trespassing into any area cordoned off by the NLRA for exclusive federal regulation.
In Fort Halifax Packing Co. v. Coyne (1987) 482 U.S. 1 [96 L.Ed.2d 1, 107 S.Ct. 2211] (Fort Halifax), the United States Supreme Court extended these principles to a state law guaranteeing employees a severance payment in the event of a plant closing. The high court reiterated that “the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining.” (Id. at p. 20.) States may regulate what might otherwise be the subject of negotiation; “ ‘[Tjhere is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the subject of collective bargaining.’ ” (Id. at pp. 21-22.) Given that “ ‘Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety . . .’ ” (id. at p. 22), Maine could by statute provide employees some minimal economic security, in the event of a plant closing, without running afoul of the NLRA.
Our own decision in Industrial Welfare Com. v. Superior Court (1980) 27 Cal.3d 690 [166 Cal.Rptr. 331, 613 P.2d 579] presaged the high court’s later recognitions of the power of localities to promote public health and safety through regulation of the employer-employee relationship without falling prey to Machinists preemption. We considered there whether federal preemption precluded the state Industrial Welfare Commission from issuing wage orders regulating the minimum wages, maximum hours, and conditions of employment for employees in a range of industries. We rejected the argument out of hand, relying on what we viewed as settled precedent that “the federal labor laws do not ‘preempt ... the field of regulating working conditions ....’” (Industrial Welfare Com., at p. 728, fn. 16, quoting Terminal Assn. v. Trainmen (1943) 318 U.S. 1, 7 [87 L.Ed. 571, 63 S.Ct. 420].) Instead, we recognized preemption was confined to circumstances in which local regulation interfered with the process of organizing and bargaining, *197 including the use of economic weapons to achieve particular bargaining goals. (Industrial Welfare Com., at p. 728, fn. 16.)
As these cases demonstrate, at the core of Machinists preemption is the principle that, in specific instances, one may discern from the text and structure of the NLRA a basis for inferring that Congress affirmatively intended to leave a particular subject free from farther NLRB and state and local government regulation. “Machinists pre-emption is based on the premise that ‘ “Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.” ’ ” (Chamber of Commerce of United States v. Brown, supra, 554 U.S. at p. 65, quoting Machinists, supra, 427 U.S. at p. 140, fn. 4.) “[A]s in any pre-emption analysis, ' “[t]he purpose of Congress is the ultimate touchstone.” ’ ” (Metropolitan Life, supra, 471 U.S. at p. 747.)
Given that Congress’s purpose was to regulate the process of establishing terms of employment, not the content of those terms (Metropolitan Life, supra, 471 U.S. at p. 753; Fort Halifax, supra, 482 U.S. at p. 20), it follows that the areas Congress intended to leave free of local regulation are those relating to the process by which an employment agreement is reached: matters of self-organization and collective bargaining. (See Metropolitan Life, at p. 751.) In sharp distinction, because the NLRA is not a federal code of employment law, Machinists preemption does not extend to local establishment of substantive employment terms: “Such regulation provides protections to individual union and nonunion workers alike, and thus ‘neither encourage[s] nor discourage^] the collective-bargaining processes that are the subject of the NLRA.’ ” (Fort Halifax, at pp. 20-21; see also Southern California Edison Co. v. Public Utilities Com. (2006) 140 Cal.App.4th 1085, 1100 [45 Cal.Rptr.3d 485] [Local employment regulation is permitted “as long as the purpose of the law or regulation is not incompatible with the general goals of the NLRA to restore the equality of bargaining power and resolve the problem of depressed wages.”].)
With these principles in mind, we consider whether the text or structure of the NLRA evidences any intent to preclude worker retention ordinances such as the one at issue here.
B. Application to the Ordinance
We begin with an initial presumption against preemption. (E.g., Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc. (1993) 507 U.S. 218, 224 [122 L.Ed.2d 565, 113 S.Ct. 1190].) This presumption is particularly heavy here because the subject matter, the employer-employee relationship, is one traditionally regulated by *198 state and local governments under their police powers. (Fort Halifax, supra, 482 U.S. at p. 21 [“[P]re-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State.”].) Thus, we consider whether there is evidence of a “ ' “clear and manifest’ ’ ” congressional intent (Bronco Wine Co. v. Jolly (2004) 33 Cal.4th 943, 957 [17 Cal.Rptr.3d 180, 95 P.3d 422]) to bar at any level the regulation of employee retention during ownership transitions (see Metropolitan Life, supra, 471 U.S. at p. 749).
Examining the text and structure of the NLRA, we discern no evidence that Congress affirmatively intended to leave the subject of employee retention unregulated by states and municipalities. On the subject of employee hiring and firing, the text of the NLRA is, with one notable exception, resoundingly silent. It neither guarantees nor prohibits the retention of employees; it does not affirmatively protect new employers’ latitude to hire and fire whomever they please, nor does it address in any way the power of states and localities to regulate the subject. The only portion of the NLRA to speak to these matters, section 8(a)(3), protects employees from discrimination on the basis of union affiliation; an employer may not use the power to hire and fire to exercise antiunion animus and eliminate prounion employees from its workforce. (See 29 U.S.C. § 158(a)(3).)
This silence leaves unrebutted the initial presumption that Congress did not intend preemption. The NLRA’s statutory text does not disturb state and local authority to address, as these entities see fit, matters of hiring and firing, authority traditionally recognized as a core incident of their police power. (See De Canas v. Bica (1976) 424 U.S. 351, 356 [47 L.Ed.2d 43, 96 S.Ct. 933] [“States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.”].) Thus it is that states and localities have long been permitted to provide common law wrongful discharge remedies (e.g., Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330]) and enact statutes of general application regulating hiring and firing (e.g., Gov. Code, § 12900 et seq. [Cal. Fair Employment and Housing Act]) without intruding upon the NLRA’s narrowly tailored concerns.
The congressional silence concerning the subject matter of the Ordinance distinguishes this case from those where the United States Supreme Court has found Machinists preemption. (See Machinists, supra, 427 U.S. 132.) Without exception, preemption in each was traceable in part to specific statutory language evincing a congressional intent to regulate only at the federal level. (See Chamber of Commerce of United States v. Brown, supra, 554 U.S. at pp. 67-69 [preempting a statute that effectively limited employer speech about union organizing, where Congress in §§ 7, 8(a), 8(b), and 8(c) of the *199 NLRA (29 U.S.C. §§ 157, 158(a), (b), (c)) already had regulated the extent to which employer speech should be permitted]; Golden State Transit Corp. v. Los Angeles, supra, 475 U.S. at pp. 614-618 [preempting municipal action that compelled a settlement, where Congress in § 8(d) of the NLRA (29 U.S.C. § 158(d)) had imposed only a duty to bargain, not to agree]; Machinists, at pp. 143-151 [preempting a state bar on slowdowns, where Congress in § 8 of the NLRA (29 U.S.C. § 158) had already identified those economic weapons it found necessary to bar]; Teamsters Union v. Morton (1964) 377 U.S. 252, 258-260 [12 L.Ed.2d 280, 84 S.Ct. 1253] [preempting regulation of economic weapons, where Congress had already spoken in §§ 7 and 8 of the NLRA (29 U.S.C. §§ 157, 158) to the availability of economic weapons in obtaining negotiating concessions, and specifically to secondary boycotts in 29 U.S.C. § 187].)
Instead, the Ordinance on its face appears of a piece with other state and local regulations upheld against claims of Machinists preemption, a part of the background tapestry of state and local laws against which unions and employers may negotiate when reaching the terms of a collective bargaining agreement. While the Ordinance regulates the existence of the employment relationship rather than just its terms, this distinction is not crucial; federal courts routinely have upheld as not preempted under Machinists employment laws that broadly regulate hiring and firing. (See St. Thomas-St. John Hotel v. Government of U.S. Virgin Islands (3d Cir. 2000) 218 F.3d 232, 243 [upholding a U.S. Virgin Islands wrongful termination statute as a minimum substantive requirement permitted under Metropolitan Life and Fort Halifax]; Peabody Galion v. Dollar (10th Cir. 1981) 666 F.2d 1309, 1316-1319 [upholding an Okla. wrongful discharge statute against claimed Machinists preemption].) Like the health benefits law in Metropolitan Life, supra, 471 U.S. 724, and the severance benefits law in Fort Halifax, supra, 482 U.S. 1, the Ordinance regulates the terms and conditions of employment, extending the benefit of a potential temporary extension of employment to each employee individually, rather than conferring a collective right, and applying the benefit to all employees equally, irrespective of union or nonunion status. (See Fort Halifax, at pp. 20-21; Metropolitan Life, at p. 755.)[7]
*200 What the Ordinance does not do, in contrast, is “ ‘[enter] into the substantive aspects of the bargaining process to an extent Congress has not countenanced.’ ” (Machinists, supra, 427 U.S. at p. 149.) It does not regulate the process by which a bargaining agreement may be reached. Nor does the Ordinance speak directly to the process of organizing; rather, it temporarily preserves the status quo, whatever that might be, whether the workforce is unionized or not. (See Metropolitan Life, supra, 471 U.S. at p. 755 [“Nor do [local labor and employment standards] have any but the most indirect effect on the right of self-organization established in the Act.”].) And, while the Ordinance does confer on each employee, as an individual, certain rights the individual employees might otherwise have obtained only through organizing and collective bargaining, it is well established that so doing is no basis for Machinists preemption. (See Fort Halifax, supra, 482 U.S. at pp. 21-22; Metropolitan Life, at pp. 751-758; Malone v. White Motor Corp. (1978) 435 U.S. 497, 504-505 [55 L.Ed.2d 443, 98 S.Ct. 1185].)[8]
While recognizing that the Ordinance on its face does not regulate organizing or bargaining, Grocers contends it is nevertheless preempted because of its indirect effects on those subjects. Grocers’s principal argument, accepted by the Court of Appeal majority, is that the Ordinance alters how the NLRB would decide successorship questions, i.e., whether and to what extent labor liabilities and bargaining or contractual obligations should follow when ownership of a unionized business is transferred from one entity to another.
The NLRA does not speak to successorship. Consequently, successorship questions are governed by federal common law. (Howard Johnson Co. v. Hotel Employees (1974) 417 U.S. 249, 255-256 [41 L.Ed.2d 46, 94 S.Ct. 2236].) In a trilogy of cases (John Wiley & Sons v. Livingston (1964) 376 U.S. 543 [11 L.Ed.2d 898, 84 S.Ct. 909]; NLRB v. Burns Security Services (1972) 406 U.S. 272 [32 L.Ed.2d 61, 92 S.Ct. 1571]; Howard Johnson Co., supra, 417 U.S. 249), the United States Supreme Court outlined the circumstances *201 and considerations that might lead a court to conclude the new owner of a business should be bound by an existing bargaining agreement entered into by its predecessor or have an independent duty to negotiate with a union that had represented the predecessor workforce.[9]
A premise of Grocers’s general argument is that these cases ratify a new owner’s right, untouchable by state or local regulation, not to hire its predecessor’s employees upon acquiring a new store. The Court of Appeal majority agreed; reversing the trial court on this point, it embraced the existence of such a right as a basis for federal preemption. Upon close examination, these authorities do not support Grocers’s claim.
The language Grocers and the Court of Appeal majority rely upon traces to NLRB v. Burns Security Services, supra, 406 U.S. 272. In the course of analyzing a new employer’s legal obligations, the United States Supreme Court explained: “The [NLRB] has never held that the National Labor Relations Act itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer.” (Id. at p. 280, fn. 5, italics added.) The Supreme Court reiterated the point the following year, noting that “the purchaser [of a business] is not obligated by the Act to hire any of the predecessor’s employees . . . .” (Golden State Bottling Co. v. NLRB (1973) 414 U.S. 168, 184, fn. 6 [38 L.Ed.2d 388, 94 S.Ct. 414], italics added, citing Burns, at p. 280, fn. 5.)
Notwithstanding these statements, the petitioner union in Howard Johnson Co. v. Hotel Employees, supra, 417 U.S. 249, contended federal common law and the existing collective bargaining agreement should be interpreted so that “ ‘the successor does not have the right not to hire ....’” (Id. at p. 261, fn. 7.) The Supreme Court rejected the argument: “What the Union seeks here is completely at odds with the basic principles this Court elaborated in Burns. We found there that nothing in the federal labor laws ‘requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer.’ ” (Id. at p. 261, quoting NLRB v. Burns Security Services, supra, 406 U.S. at p. 280, fn. 5, and citing Golden State Bottling Co. v. NLRB, supra, 414 U.S. at p. 184, fn. 6.) The *202 court thereafter used shorthand for the principle that the NLRA and federal common law do not compel retention of predecessor employees. (See Howard Johnson, at p. 262 [“Clearly, Burns establishes that Howard Johnson had the right not to hire any of the former Grissom employees, if it so desired.”]; id. at p. 264 [recognizing that “employees of the terminating employer have no legal right to continued employment with the new employer . . .” and acknowledging “the new employer’s right to operate the enterprise with his own independent labor force”]; see also Fall River Dyeing & Finishing Corp. v. NLRB, supra, 482 U.S. at p. 40 [explaining that Burns held a “successor is under no obligation to hire the employees of its predecessor”].)
That the United States Supreme Court was using “right” in this instance in the sense of a Hohfeldian privilege[10] against any asserted duty arising from federal common law or an existing collective bargaining agreement to hire particular workers, and not to describe an immunity from the state or local regulation of such hiring,* [11] is clear from the context. This was what Burns had said (see NLRB v. Burns Security Services, supra, 406 U.S. at p. 280, fn. 5), what Golden State Bottling had said (see Golden State Bottling Co. v. NLRB, supra, 414 U.S. at p. 184, fn. 6), and what Howard Johnson itself said when it explained that “nothing in the federal labor laws ‘requires’ ” a business purchaser to hire predecessor employees (Howard Johnson Co. v. Hotel Employees, supra, 417 U.S. at p. 261).[12] Howard Johnson was not a preemption case and did not at any point contemplate whether a successor’s hiring choices might be regulated or restricted by sources other than an existing collective bargaining agreement or federal common law. It thus does not resolve the preemption issue here. (See R. A. V. v. St. Paul (1992) 505 U.S. 377, 386, fn. 5 [120 L.Ed.2d 305, 112 S.Ct. 2538] [“It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.”].)[13]
*203 The dissent’s assertion otherwise, viz., that the NLRA was founded on and assumes an employer’s unfettered right to select its employees, cannot withstand historical scrutiny. For decades, the United States Supreme Court had invoked employer liberty of contract to strike down employee-protective legislation. (See, e.g., Adair v. United States (1908) 208 U.S. 161, 174 [52 L.Ed. 436, 28 S.Ct. 277] [holding unconstitutional a federal ban on yellow-dog contracts conditioning hiring on an agreement not to join a union because “it is not within the functions of government ... to compel any person in the course of his business and against his will to accept or retain the personal services of another . . .”]; see also Coppage v. Kansas (1915) 236 U.S. 1, 9-21 [59 L.Ed. 441, 35 S.Ct. 240] [invalidating a state ban on identical grounds].) Far from yielding to such edicts, Congress in the NLRA defied them. (See 29 U.S.C. § 158(a)(3) [prohibiting yellow-dog contracts].)[14] The Supreme Court acceded to this judgment, reversing course and holding that both Congress and the several states could constrict an employer’s freedom to hire without violating liberty of contract. (See Labor Board v. Jones & Laughlin, supra, 301 U.S. at pp. 43-46 [rejecting liberty of contract challenge to the NLRA]; Lincoln Union v. Northwestern Co. (1949) 335 U.S. 525, 534-537 [93 L.Ed. 212, 69 S.Ct. 251] [rejecting Adair and Coppage and upholding a state’s right similarly to regulate employer hiring].) To start from the premise that the NLRA is founded upon employer liberty of contract, as the dissent does, is to stand history on its head.[15]
*204 We think the closer question is whether, as Grocers contends, the Ordinance is preempted because its indirect effects impermissibly intrude on successorship determinations that Congress intended to leave free of local regulation. The party asserting preemption, Grocers, has the burden of demonstrating both the minor and major premises: that the Ordinance intrudes on successorship determinations, and that Congress did not want such indirect effects. (See Bronco Wine Co. v. Jolly, supra, 33 Cal.4th at pp. 956-957.) Because neither premise has been established, we decline to find preemption on this basis as well.
The successorship inquiry is highly fact dependent, to be decided on a case-by-case basis after consideration of numerous factors. (See Fall River Dyeing & Finishing Corp. v. NLRB, supra, 482 U.S. at p. 43; Howard Johnson Co. v. Hotel Employees, supra, 417 U.S. at p. 256.) The United States Supreme Court has not had occasion to consider whether in assessing business continuity for successorship purposes a temporary, involuntary retention of a workforce is materially different from a permanent, voluntary retention, but language in the court’s opinions supports the view that it is. (See Fall River Dyeing, at p. 41 [considering as relevant to successorship whether a “new employer makes a conscious decision” to retain employees, because it demonstrates “the employer intends to take advantage of the trained work force of its predecessor”]; NLRB v. Burns Security Services, supra, 406 U.S. at p. 278 [upholding the imposition of a duty to bargain based in part on the fact a successor employer had “selected as its work force the employees of the previous employer”].)
The NLRB likewise has not formally spoken to the effect of a 90-day retention ordinance on the successorship inquiry, but several of the agency’s administrative law judges (ALJ’s) have. In U.S. Service Industries, Inc. (NLRB, Dec. 13, 1995, No. 5-CA-24575) 1995 N.L.R.B. Lexis 1151, pages *11—*13, an ALJ imposed a bargaining obligation on a new employer because there was substantial business continuity, as the employer had conceded. But notwithstanding that concession, the employer argued it should not succeed to the predecessor’s bargaining obligation because its initial hiring was dictated by a temporary retention ordinance. Because the NLRB had not as yet formally differentiated between voluntary and involuntary initial hiring, the ALJ, not feeling at liberty to establish new precedent, rejected the argument. (Id. at p. *12.)
More helpful in discerning the current federal rule is M&M Parkside Towers LLC (NLRB, Jan. 30, 2007, No. 29-CA-27720) 2007 N.L.R.B. Lexis 27. There, an ALJ found an obligation to bargain where the new employer was running the same business with the same employees, who had been initially hired pursuant to a 90-day retention ordinance but thereafter retained voluntarily based on their satisfactory performance. (Id. at pp. *11-*14.) Although *205 the employer argued that in the absence of a retention ordinance it would not have hired the predecessor’s employees, the ALJ rejected the argument inter alia for want of proof. Because the employer had offered no lawful, nondiscriminatory reason for why it would have refused to hire the predecessor employees, it had failed to establish as a factual matter that the retention ordinance affected the initial hiring. (Id. at p. *13.)
Of significance, the ALJ embraced the NLRB general counsel’s argument that the obligation to bargain as a successor arose only after expiration of the initial 90-day period. During the temporary retention period, whether the new employer would ultimately retain a majority, or indeed any, of the predecessor workforce was unclear. Only on day 113—when the new employer was free of any retention ordinance restrictions, had evaluated each employee’s performance, had judged each satisfactory, and had voluntarily extended to each an offer of permanent employment—did a bargaining obligation attach. (M&M Parkside Towers LLC, supra, 2007 N.L.R.B. Lexis 27 at pp. *6-*8, *15-*18.)[16]
Summarizing the import of these decisions, the federal district court in Rhode Island Hospitality Assn. v. City of Providence (D.R.I. 2011) 775 F.Supp.2d 416 recently concluded: “[Ejxisting case law indicates that the successor employer will be obligated to bargain with [a union] only if the successor employer retains its predecessor’s employees beyond the mandatory employment period or if it extends an offer for permanent employment prior to expiration of the mandatory retention period.” (Id. at p. 432.) We agree. Until that point, the predecessor’s employees are essentially probationary and no basis exists for concluding one of the prerequisites of a successor-ship bargaining obligation, the hiring of a majority of the predecessor’s employees (see Fall River Dyeing & Finishing Corp. v. NLRB, supra, 482 U.S. at p. 47; NLRB v. Burns Security Services, supra, 406 U.S. at p. 278), will come to pass. It follows that retention ordinances like the Ordinance here do not dictate the outcomes of the successorship inquiry in any way that would call for Machinists preemption. (Rhode Island Hospitality Assn., at p. 433; see also Washington Service Contractors v. Disk of Columbia, supra, 54 F.3d at pp. 816-817.)
Additionally, we can discern in the NLRA no clear and manifest congressional intent to foreclose indirect impacts on successorship. As with any preemption question, “ ' “[t]he purpose of Congress is the ultimate touchstone” ’ ” (Metropolitan Life, supra, 471 U.S. at p. 747), and on this *206 point we find neither textual nor historical support. Successorship is a question of federal common law because “[n]o provision of the [NLRA] even mentions successorship.” (McLeod, Rekindling Labor Law Successorship in an Era of Decline (1994) 11 Hofstra Lab. LJ. 271, 342, fn. 289.) By ignoring entirely the issue of successorship, Congress left no indication of any views on the matter. Accordingly, nothing suggests it intended states and their subdivisions to be displaced from regulating in any otherwise permissible way that could affect, even incidentally, how a federal court or agency ultimately might decide an individual successorship question.[17]
In a related vein, Grocers contends the Ordinance affects successor-ship by preserving unionized workplaces intact, preventing a new owner from hiring without regard to union status, and placing new owners at risk from unfair labor practice charges if they elect not to retain a significant portion of the workforce after expiration of the temporary 90-day window. What these arguments omit is that the Ordinance applies equally to unionized and nonunionized workplaces. It does not selectively preserve or favor unionization or unionized workers; it simply preserves, temporarily, the status quo, whatever that might be. Just as an employer taking over a formerly unionized workplace might, if left to its own devices, hire a less union-friendly workforce through regression to the mean, rather than because of any animus, so might an employer taking over a formerly nonunionized or even antiunion workplace through a similar effect tend to wind up with a more prounion workforce in the absence of the Ordinance. In the aggregate, a new owner hiring nonmanagement employees from the pool dictated by the Ordinance is neither more nor less likely to wind up with prounion workers than if it were to hire freely from the workforce at large, assuming antiunion animus truly plays no part in its hiring decisions, as the NLRA demands. (29 U.S.C. § 158(a)(3); Howard Johnson Co. v. Hotel Employees, supra, 417 U.S. at p. 262, fn. 8; NLRB v. Burns Security Services, supra, 406 U.S. at pp. 280-281, fn. 5; Phelps Dodge Corp. v. Labor Board (1941) 313 U.S. 177, 183-185 [85 L.Ed. 1271, 61 S.Ct. 845].)
*207 Nor does the Ordinance place the new owner at greater risk of an unfair labor practice charge than were there no Ordinance. Irrespective of the Ordinance, a new owner would be subject to an unfair labor practice charge if it manipulated its hiring specifically to discriminate against union members and avoid successorship obligations. (Great Lakes Chemical Corp. v. N.L.R.B. (D.C. Cir. 1992) 296 U.S. App.D.C. 257 [967 F.2d 624, 627-628]; see Howard Johnson Co. v. Hotel Employees, supra, 417 U.S. at p. 262, fn. 8.) In deciding whom to hire from the Ordinance pool and whom to retain or dismiss at the conclusion of the 90-day period, a new owner has the same freedom to choose employees without regard to union status or sentiment, and the same theoretical exposure to an unfair labor practice charge if it were to allow antiunion animus to enter its decisionmaking, as it would without the Ordinance.[18]
Grocers posits the hypothetical of a union organizing and being named bargaining representative for the workplace within the first 90 days, then filing an unfair labor practice charge if many or most of the employees are discharged and the new employer refuses to recognize the union. It does not explain how this scenario is a particular risk occasioned by the Ordinance. If the retained workers were already represented by a union, there would be no occasion for an immediate organizing drive, while if they were not, a union could mount the very same organizing drive absent the Ordinance and would be as likely to file the very same unfair labor practice charge if the response was to dismiss employees en masse.
We are not the first court to consider these questions. The City is not unique in California in enacting a worker retention ordinance, nor is California alone in having its municipalities do so.[19] A small but growing number of federal courts have considered the argument that such ordinances are preempted under Machinists (see Machinists, supra, 427 U.S. 132); to a one, they have concluded, as we do, that neither indirect effects on successorship nor any other aspect of the ordinances gives rise to preemption. (See Washington Service Contractors v. Dist. of Columbia, supra, 54 F.3d at pp. 817-818 [D.C. retention ordinance does not “disturb[] the process established by the *208 NLRA for resolving labor disputes” and is permissible “substantive employee protective legislation having nothing to do with rights to organize or bargain collectively”]; Rhode Island Hospitality Assn. v. City of Providence, supra, 775 F.Supp.2d at p. 433 [Providence retention ordinance “is primarily designed to provide temporary job protection to both unionized and non-unionized employees [,] which does not constitute a significant intrusion into the equitable collective bargaining process established by the NLRA”]; Alcantara v. Allied Properties, LLC (E.D.N.Y. 2004) 334 F.Supp.2d 336, 345 [N.Y. City retention ordinance “does not conflict with or inhibit the bargaining or dispute resolution process established by the NLRA,” nor does it “regulate economic self-help activities”].) We join the developing consensus.
We close with an observation concerning our role. “In labor preemption cases . . . our office is not to pass judgment on the reasonableness of state [or local] policy .. . .” (Livadas v. Bradshaw, supra, 512 U.S. at p. 120.) When evaluating claims of NLRA preemption, we may not substitute our own views of sound economic policy for those of the elected branches. (See St. Thomas-St. John Hotel v. Government of U.S. Virgin Islands, supra, 218 F.3d at p. 246 [rejecting the “unsettling supposition” that courts should use preemption to strike down local hiring and firing laws as impermissible intrusions into “an area that has traditionally been left to the freedom of contract between an employer and an employee”].) Rather, we inquire solely into whether the challenged regulation is one Congress sought to preclude; if the text and structure of the NLRA demonstrate an affirmative intent to leave the subject matter of the Ordinance untouched by state and local regulation, only then may we find it preempted. Having found no such indication, we conclude the presumption against preemption has not been rebutted and Machinists does not apply.
III. Equal Protection
As an alternate basis for affirmance, Grocers contends the Ordinance violates the equal protection clauses of both the state and federal Constitutions. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) We consider the question de novo. (E.g., Garcia v. Four Points Sheraton LAX (2010) 188 Cal.App.4th 364, 381 [115 Cal.Rptr.3d 685].) We conclude the Ordinance is constitutional.
A. Constitutional Principles
As the trial court concluded, and as all parties agree, because the Ordinance involves neither suspect classifications nor fundamental rights or interests it is subject only to “rational basis” or “rational relationship” review. *209 (See Hernandez v. City of Hanford (2007) 41 Cal.4th 279, 299 [59 Cal.Rptr.3d. 442, 159 P.3d 33].) “ ‘[I]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.’ ” (Warden v. State Bar (1999) 21 Cal.4th 628, 644 [88 Cal.Rptr.2d 283, 982 P.2d 154], italics added by Warden, quoting FCC v. Beach Communications, Inc. (1993) 508 U.S. 307, 313 [124 L.Ed.2d 211, 113 S.Ct. 2096].) So long as the challenged distinction “bear[s] some rational relationship to a conceivable legitimate state purpose” (Westbrook v. Mihaly (1970) 2 Cal.3d 765, 784 [87 Cal.Rptr. 839, 471 P.2d 487]; accord, Hernandez, at p. 299; Warden, at p. 641), it will pass muster; once we identify “ ' “plausible reasons” for [the classification] “our inquiry is at an end” ’ ” (Warden, at p. 644, quoting FCC v. Beach Communications, Inc., at p. 313). Of significance to our inquiry, “because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.” (FCC v. Beach Communications, Inc., at p. 315.) The burden is on Grocers, as the party challenging the Ordinance, to negate any such rational basis or relationship to a conceivable legitimate purpose. (FCC v. Beach Communications, Inc., at p. 315; Hernandez, at p. 299.)
B. Application
Subject to a union’s and an employer’s ability to opt out through collective bargaining (L.A. Mun. Code, § 181.06), the Ordinance applies to retail stores over 15,000 square feet in size that primarily sell household food for offsite consumption—in other words, large grocery stores (id., § 181.01, subd. E; see also id., § 12.24, subd. U. 14(a) [excluding membership stores]). Grocers takes issue with four distinctions implicit in this scope: (1) between nonmember grocery stores and membership stores; (2) between grocery stores more than and less than 15,000 square feet in size; (3) between grocery stores and restaurants; and (4) between grocery stores where a unionized workforce has agreed to different terms and those where it has not.
In evaluating the City’s determination of the scope of the Ordinance, we are mindful that the decision how broadly and in what manner to attack perceived problems is for the elected branches in the first instance. Past decisions by both this court and the United States Supreme Court “establish that, under the rational relationship test, the state may recognize that different categories or classes of persons within a larger classification may pose varying degrees of risk of harm, and properly may limit a regulation to those classes of persons as to whom the need for regulation is thought to be more *210 crucial or imperative.” (Warden v. State Bar, supra, 21 Cal.4th at p. 644, citing American Bank & Trust Co. v. Community Hospital (1984) 36 Cal.3d 359, 371 [204 Cal.Rptr. 671, 683 P.2d 670], and Williamson v. Lee Optical Co. (1955) 348 U.S. 483, 489 [99 L.Ed. 563, 75 S.Ct. 461].) “Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. [Citation.] Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.” (Williamson, at p. 489.) Such line drawing is the province of legislative bodies, and “the precise coordinates of the resulting legislative judgment [are] virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.” (FCC v. Beach Communications, Inc., supra, 508 U.S. at p. 316.)
Here, the City elected to impose temporary job retention requirements on large grocery stores, but not on, e.g., restaurants or membership clubs that also sell food. (See L.A. Mun. Code, §§ 12.24, subd. U. 14(a), 181.01, subd. E.) The City believed supermarkets function as community anchors, a judgment it is not our role to question. (See id., § 181.00 [“Supermarkets and other grocery retailers are the main points of distribution for food and daily necessities for the residents of Los Angeles and are essential to the vitality of any community.”].) Given their perceived significance, the City rationally could conclude it was more important to ensure stability and continuity at such entities than at restaurants or members-only stores that arguably do not serve a similarly crucial function. The trial court correctly rejected Grocers’s equal protection argument on these grounds.
As to the constitutionality of the Ordinance’s size distinction, the Ordinance on its face has as one of its purposes the promotion of job security and the minimization of community disruption that arises from job losses and changes. (See L.A. Mun. Code, § 181.00 [“Through this ordinance, the City seeks to sustain the stability of a workforce that forms the cornerstones of communities in Los Angeles.”].) The City rationally could conclude both that disruptions at larger stores, involving larger workforces, would have a larger impact on the community, and that larger stores would be more readily positioned to absorb any short-term burdens the Ordinance’s requirements might impose on employers. (See Garcia v. Four Points Sheraton LAX, supra, 188 Cal.App.4th at p. 384 [upholding size classification as rationally related to a business’s ability to bear regulatory burdens].) Both Congress and the state Legislature frequently, and constitutionally, have incorporated exceptions for smaller employers when regulating the employment relationship. (See, e.g., 42 U.S.C. § 2000e(b) [tit. VII small-employer exception]; Gov. Code, § 12926, subd. (d) [Cal. Fair Employment and Housing Act small-employer exception].) So long as we can identify a rational relationship between a classification and at least one legitimate purpose of an enactment, the classification will pass constitutional muster. (See Hernandez v. City of *211 Hanford, supra, 41 Cal.4th at pp. 299-302 [rejecting an equal protection challenge to a store size classification because size was rationally related to community impact].)
Finally, concerning the Ordinance’s opt-out provision (L.A. Mun. Code, § 181.06), the United States Supreme Court has made clear that affording employers and unions the right to opt out and negotiate their own terms increases the likelihood a given regulation will be found not preempted by the NLRA. (Fort Halifax, supra, 482 U.S. at p. 22.) An opt-out provision thus is rationally related to the desire to enact valid (nonpreempted) legislation, as well as to the legitimate goal of “balanc[ing] the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment.” (Ibid.; see also Viceroy Gold Corp. v. Aubry (9th Cir. 1996) 75 F.3d 482, 490-491 [upholding labor protections subject to a collective bargaining opt-out provision because the Legislature rationally could have believed unionized workers are competent to negotiate their own protections]; Garcia v. Four Points Sheraton LAX, supra, 188 Cal.App.4th at pp. 385-386 [applying Viceroys rationale to uphold an L.A. Mun. Code collective bargaining opt-out provision identical to the one at issue here].)
Disposition
For the foregoing reasons, we reverse the Court of Appeal’s judgment and remand this case for further proceedings consistent with this opinion.
Cantil-Sakauye, C. J., Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

 The Ordinance mirrors grocery worker retention ordinances adopted by various other California municipalities (see Gardena Mun. Code, ch. 5.10; S.F. Police Code, art. 33D; Santa Monica Mun. Code, ch. 5.40) and is substantially similar to worker retention ordinances for other fields adopted in California (e.g., Berkeley Mun. Code, ch. 13.25 [marina business workers]; Emeryville Mun. Code, tit. 5, ch. 32, § 5-32.1.1(b) [hotel workers]; L.A. Mun. Code, § 183.00 et seq. [hotel workers]; Oakland Mun. Code, ch. 2.36 [hospitality workers]; San Jose Mun. Code, § 25.11.700 et seq. [airport business workers]) and throughout the United States (N.Y. City Admin. Code, tit. 22, ch. 5, § 22-505 [building service workers]; Philadelphia Mun. Code, ch. 9-2300 [service contract workers]; Providence, R.I., Code of Ord., §§ 2-18.5 [hospitality workers], 14-16 [building service workers]; D.C. Off. Code, § 32-101 et seq. [health care, food service, and janitorial workers]).

 Health and Safety Code section 113709, a savings clause preserving local authority over certain subjects not relevant here, does not affect our disposition of this case.

 As examples of the sorts of concerns addressed and level of detail provided by the Retail Food Code, the statutory scheme specifies, to the degree and minute, the temperatures at which various foods must be stored and cooked (Health & Saf. Code, §§ 113996, 114004), to the hour, how long food contact surfaces may go between cleanings (id., § 114117), and, to the inch, how large food preparation sinks must be (id., § 114163).

 To rest preemption analysis solely on considerations of purpose would generate the anomalous circumstance, rejected by the United States Supreme Court, that one jurisdiction’s measure might survive preemption, while another identical measure passed in a different jurisdiction might fall, “merely because its authors had different aspirations.” (Shady Grove Orthopedic Associates, P. A. v. Allstate Ins. Co. (2010) 559 U.S. __, __ [176 L.Ed.2d 311, 130 S.Ct. 1431, 1441].)

 See Health and Safety Code section 113947.1, subdivision (f) (“The responsibilities of a certified owner or employee . . . shall include the safety of food preparation and service, including ensuring that all employees who handle, or have responsibility for handling, nonprepackaged foods of any kind, have sufficient knowledge to ensure the safe preparation or service of the food, or both.”).

 See Los Angeles Municipal Code section 181.01, subdivision C (“ ‘Eligible Grocery Worker’ does not include a managerial, supervisory, or confidential employee.”).

 The Ordinance’s neutrality is essential to its validity. Just as employment regulations aimed solely at unionized workers may intrude into aspects of organizing and bargaining Congress intended the states not to regulate, so may regulations that apply only to nonunionized workers and select out unionized workers for disfavored status be preempted as forcing employees to choose between exercising their right to enter a collective bargaining agreement and having their state-granted employment rights enforced. (See Livadas v. Bradshaw (1994) 512 U.S. 107, 116-118 [129 L.Ed.2d 93, 114 S.Ct. 2068].) In contrast, employment regulations, such as the 90-day retention period imposed by the Ordinance, that “affect union and nonunion employees equally . . . neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA.” (Metropolitan Life, supra, 471 U.S. at p. 755.)

 Grocers argues that the Ordinance cannot qualify as a generally applicable employment standard because it regulates only a single industry. (See Chamber of Commerce of U.S. v. Bragdon (9th Cir. 1995) 64 F.3d 497, 504.) However, the Ninth Circuit Court of Appeals has effectively repudiated Bragdon (see Associated Builders and Contractors, Southern California v. Nunn (9th Cir. 2004) 356 F.3d 979, 990), and a majority of other circuits have limited Bragdon to its facts (see Rondout Electric, Inc. v. New York State Dept. of Labor (2d Cir. 2003) 335 F.3d 162, 169; St. Thomas-St. John Hotel v. Government of U.S. Virgin Islands, supra, 218 F.3d at p. 244; but see 520 South Michigan Avenue Associates v. Shannon (7th Cir. 2008) 549 F.3d 1119, 1131-1137 [following Bragdon]). Bragdon also has been squarely rejected by the only previous California decision to consider its reasoning. (See Southern California Edison Co. v. Public Utilities Com., supra, 140 Cal.App.4th at pp. 1103-1104.) Nothing in the NLRA indicates Congress intended to prevent states and localities from attacking employment problems industry by industry, as they traditionally have. (See, e.g., Martinez v. Combs (2010) 49 Cal.4th 35, 57 [109 Cal.Rptr.3d 514, 231 P.3d 259] [discussing Industrial Welfare Commission’s historic industry-by-industry approach to wage orders].)

 As the court subsequently summarized, successorship depends on a consideration of the “totality of the circumstances,” including “whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.” (Fall River Dyeing & Finishing Corp. v. NLRB (1987) 482 U.S. 27, 43 [96 L.Ed.2d 22, 107 S.Ct. 2225].)

 See Hohfeld, Fundamental Legal Conceptions as Applied in Judicial Reasoning and Other Legal Essays (1919) pages 38-50 (explaining a “privilege” as the negation of a duty to another).

 As Justice Kennedy has explained, Machinists preemption arises when the NLRA confers on an entity in “the familiar Hohfeldian terminology ... an immunity from” state and local regulation. (Golden State Transit Corp. v. Los Angeles (1989) 493 U.S. 103, 115 [107 L.Ed.2d 420, 110 S.Ct. 444] (dis. opn. of Kennedy, J.).)

 Indeed, it was what the court had said as far back as 1937. (See Labor Board v. Jones & Laughlin (1937) 301 U.S. 1, 45 [81 L.Ed. 893, 57 S.Ct. 615] [“The Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them.” (italics added)].)

 We observe that the United States Court of Appeals for the District of Columbia Circuit, considering essentially the identical claim, viz., that successorship principles compelled preemption of a local 90-day retention ordinance, has similarly concluded that nothing in the NLRA guarantees to new employers the right to refuse to hire predecessor employees, or even *203 the right to refuse to recognize a union constituted of them; thus, “[application of the successorship doctrine under [a 90-day retention ordinance] . . . would not require the employer to do anything that it has a right under the NLRA to refuse.” (Washington Service Contractors v. Dist. of Columbia (D.C. Cir. 1995) 311 U.S. App.D.C. 407 [54 F.3d 811, 817], cert. den. (1996) 516 U.S. 1145 [134 L.Ed.2d 96, 116 S.Ct. 1015].)

 If an employer’s liberty of contract to hire whom it chooses truly were a foundation of the NLRA, the Act’s proponents would have mentioned as much in support of the measure. They did not. (See, e.g., Remarks of Sen. Wagner, 79 Cong. Rec. 2371 (daily ed. Feb. 21, 1935) [the NLRA, also known as the Wagner Act, “merely provides that employees, if they desire to do so, shall be free to organize for their mutual protection or benefit”]; Remarks of Sen, Wagner, 79 Cong. Rec. 6184 (daily ed. Apr. 23, 1935) [decrying employers’ abuse of their ability to hire and fire as an impediment to economic recovery and describing the NLRA as a corrective measure]; Sen.Rep. No. 74-573, 1st Sess. pp. 1-4 (1935) [discussing the NLRA’s purposes without mentioning protection of employer liberty of contract].) Instead, it was the NLRA’s opponents who invoked employer liberty of contract in arguing against the Act’s constitutionality. (See, e.g., Remarks of Sen. Hastings, 79 Cong. Rec. 7676-7680 (daily ed. May 15, 1935).)

 The dissent acknowledges the NLRA enacted what were new, fiercely contested restrictions on an employer’s liberty of contract. In so doing, the dissent implicitly surrenders the larger point as well: the NLRA addresses employer liberty of contract solely to limit it; employer liberty of contract was defended only by those who opposed the Act. (Fn. 14, ante; see also Labor Board Cases (1937) 301 U.S. 76, 103 [81 L.Ed. 921, 57 S.Ct. 645] (dis. opn. of McReynolds, J.) [arguing the NLRA should be struck down for violating an employer’s right to “freely select[] those to whom his [business] operations are to be entrusted”].)

 A similar result would have obtained if the employer had voluntarily offered permanent employment to a majority of its predecessor’s employees before expiration of the 90 days. (M&M Parkside Towers LLC, supra, 2007 N.L.R.B. Lexis 27 at p. *17.)

 We do not deal here with legislation whereby a state or locality has specifically regulated the collective bargaining process, either by imposing on state-defined successors a duty to bargain and assessing state law sanctions for the refusal to bargain (Commonwealth Edison Co. v. Internat. Brotherhood of Electrical Workers (N.D.Ill. 1997) 961 F.Supp. 1169, 1181-1183) or by obligating state-defined successors to agree to the terms of existing bargaining agreements on a going-forward basis rather than negotiate their own terms with any duly authorized bargaining representative (United Steelworkers v. St. Gabriel’s Hospital (D.Minn. 1994) 871 F.Supp. 335, 342-344). (See Rhode Island Hospitality Assn. v. City of Providence, supra, 775 F.Supp.2d at p. 433 [distinguishing retention ordinances from such direct regulations of the bargaining process].) Such regulations of the very subject matter Congress expressly did choose to regulate in enacting the NLRA understandably are preempted.

 More generally, there is, as the District of Columbia Circuit has recognized, no federal right to a nonunion workplace. (See Washington Service Contractors v. Dist. of Columbia, supra, 54 F.3d at p. 817.) What matters under the NLRA is the employees’ choice of a bargaining representative (or no representative). (E.g., Labor Board v. Jones & Laughlin, supra, 301 U.S. at p. 33 [The NLRA “safeguard"] the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer.”].) Whether its employees prefer representation is, as a purely legal matter, of no moment to an employer, and whatever its employees choose, an employer under the NLRA is bound to respect. (See 29 U.S.C. §§ 158(a)(2), (5).)

 See ante, footnote 1.