# United States Court of Appeals
## For the First Circuit

No. 11-1415

RHODE ISLAND HOSPITALITY ASSOCIATION; PRI I, L.P.;
PRI XVIII, L.P.,

Plaintiffs, Appellants,

v.

CITY OF PROVIDENCE,
by and through its Treasurer, JAMES J. LOMBARDI, III,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. Mary M. Lisi, Chief U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Stahl, Circuit Judges.

Robert P. Brooks, with whom Richard R. Beretta, Jeffrey
K. Techentin, Avital R. Chatto, and Adler, Pollock & Sheehan PC
were on brief, for appellants.
Anthony F. Cottone, Deputy City Solicitor, with whom
Jeffrey M. Padwa, City Solicitor, was on brief, for appellee.
Michael T. Anderson, with whom Murphy Anderson PLLC,
Amato A. DeLuca, Jeffrey A. Mega, and DeLuca & Weizenbaum Ltd. were
on brief, for Hospitality Employees and Community Organizations,
amicus curiae.

December 2, 2011

**LYNCH, <u>Chief Judge</u>.** This case presents the issue of the constitutionality of an ordinance of the City of Providence requiring that, when there is a change in the identity of a hospitality employer, that employer must retain its predecessor's employees, subject to some conditions, for a three-month period. Plaintiffs, in their request for a pre-enforcement declaratory judgment that the ordinance is unlawful, contend that the ordinance is pre-empted under the National Labor Relations Act (NLRA), and violates the Equal Protection Clause and the Contract Clause. The district court rejected plaintiffs' claims. <u>R.I. Hospitality Ass'n</u> v. <u>City of Providence</u>, 775 F. Supp. 2d 416 (D.R.I. 2011). We affirm.

I.

This suit arises out of Ordinance 467, which was enacted by the City of Providence and regulates segments of the hospitality industry. The initial version of the Ordinance was passed on October 26, 2009; it was substantially amended on November 1, 2010. Providence, R.I., Ordinance 334 (Nov. 1, 2010) (codified at Providence, R.I., Code § 2-18.5). Only the provisions of the amended Ordinance are at issue in this suit.

The preamble to the Ordinance states that it was enacted in response to "the wholesale displacement of employees through transfers of hotel operations in New England in the recent past," which "has caused great public outcry, and has caused immeasurable

-2-

damage to the reputation of the tourist industry in the regional economy." Providence, R.I., Ordinance 334, pmbl. (Nov. 1, 2010). The stated purpose of the Ordinance is "to bolster Providence as a tourist destination, and to promote the stability of Providence's hospitality and tourism businesses." Providence, R.I., Code § 2-18.5(a).

The Ordinance regulates the "hospitality business," which includes:

> any hotel, motel, resort, boarding house, or bed and breakfast which is kept, used or advertised as, or held out to the public as, a place where sleeping or housekeeping accommodations are supplied for pay to guests . . . which is operating within the City of Providence with at least 25 rooms, and any in-house component thereof, including housekeeping services, front desk, laundry, room service, valet, bell desk, restaurant, food and/or beverage service or other operation facilitating guest services . . . .

Id. § 2-18.5(b). At least eight hotels fall within this definition.[1]

The triggering condition for operation of the Ordinance is a "change in the identity of the hospitality employer," id. § 2-18.5(c)(1), which is defined as "any event or sequence of events (including a purchase, sale, lease, or termination of a

---

[1] The Ordinance exempts from coverage "the Providence Place Mall, and any instrumentality of the State of Rhode Island, including the Rhode Island Convention Center." Providence, R.I., Code § 2-18.5(b).

-3-

management contract or lease) that causes, within a one-year period, the identity of the hospitality employer at a hospitality business to change," id. § 2-18.5(b). A "hospitality employer" is defined as "a person, whether owner or a manager, who acts as the immediate employer of the employees in a hospitality business."[2] Id.

The Ordinance requires that

> [i]n the event of a change in the identity of the employer at a hospitality business, the new employer (whether the hospitality business owner or its manager) shall retain for at least three (3) months after the commencement of operation of the hospitality business under the new hospitality business employer, those employees who were employed for at least two (2) months preceding the date on which the previous hospitality business employer's status as employer terminated.

Id. § 2-18.5(c)(1).

This three-month retention of those previously employed for two months or more is subject to three qualifications. First, such employees[3] need not be retained (or may be discharged during

---

[2] The term "person" is defined to include a variety of legal entities as well as individuals. Providence, R.I., Code § 2-18.5(b).

The term "manager" is defined as "any person who operates a hospitality business on behalf of another person pursuant to a lease, sublease, management agreement, operating agreement, franchise agreement or other arrangement." Id.

[3] The Ordinance defines an "employee" as "any person employed to perform any services by a hospitality business" who works "an average of at least twenty (20) hours per week," excluding (1) "any supervisors or managerial employees as defined in 29 U.S.C. § 152(11)" and (2) those employed "by a hospitality business as an

-4-

the three-month period) if "the new hospitality business employer determines that fewer employees are required for its full operation," in which case the employer need only "retain that number of employees needed for its new operations." Id. § 2-18.5(c)(2). Second, during the three-month period, the employer has "the right to discharge any employee . . . for good cause." Id. § 2-18.5(c)(1). Third, during the three-month period, the new employer is entitled to set the terms and conditions of employment: the employees "shall be employed under the terms and conditions established by the hospitality business buyer or manager or as required by law." Id. These provisions have an obvious, but somewhat limited, impact on the new employer's ability to choose its own different employees during the three-month period. After the three-month period elapses, the Ordinance does not purport to regulate the new employer's operations.

The Ordinance contains two other provisions of note. First, it contains a "preservation of rights" section, which provides that "[n]o provision of this Ordinance shall be construed to impair, prohibit, or provide for any right of recovery for, that lawful exercise of employees' or employers' right to engage in strike or lockout," and that "[n]othing in this Ordinance shall impose any obligation, direct or indirect, on any instrumentality of the State of Rhode Island." Id. § 2-18.5(d). Second, the

independent contractor." Providence, R.I., Code § 2-18.5(b).

-5-

Ordinance provides an enforcement mechanism. Employees who have not been retained or who have been discharged in violation of the Ordinance may bring suit in state court, subject to a three year statute of limitations, and may receive (1) backpay for each day of the violation, (2) treble damages if the violation is willful, and (3) attorneys' fees. Id. § 2-18.5(e).

## II.

The plaintiffs are PRI I, L.P., PRI XVIII, L.P., and the Rhode Island Hospitality Association. PRI I does business as the Hilton Providence and PRI XVIII does business as the Westin Providence. The Westin's workforce is unionized; the Hilton's is not. The Rhode Island Hospitality Association is a trade group of the food service, lodging, restaurant, and tourism industry in Rhode Island, and includes eight hotels within Providence (including the two individual plaintiffs), all of which are hospitality businesses within the meaning of the Ordinance.

Plaintiffs brought suit against the City of Providence requesting a declaratory judgment that the Ordinance was unlawful as well as an injunction preventing enforcement of the Ordinance. In addition to the issues raised both before the district court and on appeal, plaintiffs raised a fifth issue before the district court: that the Ordinance exceeds the City's home rule authority under state law. The fifth issue is not presented on appeal.

The parties submitted a set of stipulated facts and agreed that the case would be decided on the merits. After the parties briefed the issues and a hearing was held, the district court rejected plaintiffs' claims and entered judgment for the defendant. R.I. Hospitality, 775 F. Supp. 2d 416. This appeal followed.

## III.

Because the parties agreed to have the case decided on the merits on a set of stipulated facts, we review the district court's factual inferences for clear error and any purely legal rulings de novo. See García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643-45 (1st Cir. 2000); United Paperworkers Int'l Union, Local 14 v. Int'l Paper Co., 64 F.3d 28, 31-32 (1st Cir. 1995). Here, the parties do not dispute any facts and the only questions presented are legal, so review is de novo.

Plaintiffs advance four theories as to why they are entitled to a pre-enforcement declaratory judgment that the Ordinance is prohibited by federal law.[4] Their primary argument is

---

[4] The Ordinance, by its terms, only subjects businesses that undergo a change in the identity of the employer -- such as a purchase, sale, or management contract -- to the three-month retention requirement. None of the existing plaintiffs includes a new employer, nor do the plaintiffs allege that such a change in identity is imminent, unlike the plaintiffs in other similar cases. See Wash. Serv. Contractors Coal. v. District of Columbia, 858 F. Supp. 1219, 1223 (D.D.C. 1994) (explaining that one of the plaintiffs had been subjected to a similar ordinance, and at least one employee had asked to be retained pursuant to the ordinance), rev'd, 54 F.3d 811 (D.C. Cir. 1995).

-7-

that the Ordinance, for several reasons, is pre-empted under the NLRA's <u>Machinists</u> pre-emption doctrine. <u>See</u> <u>Lodge 76, Int'l Ass'n of Machinists</u> v. <u>Wis. Emp. Relations Comm'n</u>, 427 U.S. 132 (1976) (hereinafter <u>Machinists</u>). Second, they contend that the ordinance is pre-empted under the NLRA's <u>Garmon</u> doctrine. <u>See</u> <u>San Diego Bldg. Trades Council</u> v. <u>Garmon</u>, 359 U.S. 236 (1959). Third, they claim that the Ordinance violates the Equal Protection Clause. Finally, they argue that the Ordinance effects a violation of the Contract Clause.

Each of these claims fails and the Ordinance survives pre-enforcement review. Two other courts have considered similar arguments about similar retention ordinances and reached the same conclusion, albeit over dissenting opinions.[5] <u>See</u> <u>Wash. Serv. Contractors Coal.</u> v. <u>District of Columbia</u>, 54 F.3d 811 (D.C. Cir. 1995) (evaluating D.C. law requiring contractors who take over

---

The City does not contend the plaintiffs lack standing. The plaintiffs do allege that the Ordinance interferes with their present negotiations with unions and their current ability to engage in subcontracting, and this suffices to give Article III standing. <u>See</u> <u>Weaver's Cove Energy</u> v. <u>R.I. Coastal Res.</u>, 589 F.3d 458, 467 (1st Cir. 2009).

[5] A third court has also addressed this issue, but only in the context of whether a state case could be removed to federal court based on a pre-emption defense, which the court explained was proper only when "the pre-emptive force of a statute [is] so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim." <u>Alcantara</u> v. <u>Allied Props., LLC</u>, 334 F. Supp. 2d 336, 340 (E.D.N.Y. 2004) (quoting <u>Caterpillar Inc.</u> v. <u>Williams</u>, 482 U.S. 386, 393 (1987)) (internal quotation marks omitted).

-8-

contracts for the provision of certain services to hire their predecessors' employees for 90 days); Cal. Grocers Ass'n v. City of Los Angeles, 254 P.3d 1019 (Cal. 2011) (evaluating Los Angeles ordinance requiring grocery stores of a certain size to hire their predecessors' employees for 90 days).

A.          *Machinists* Pre-emption

While the NLRA does not contain an express pre-emption provision, the Supreme Court has developed two pre-emption doctrines applicable to the Act: Garmon pre-emption and Machinists pre-emption. The first to be developed was the Garmon doctrine, which holds that "States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc., 475 U.S. 282, 286 (1986). Garmon itself foreshadowed what was to become the Machinists doctrine, noting that the NLRB "may decide that an activity is neither protected nor prohibited, and thereby raise the question whether such activity may be regulated by the States." 359 U.S. at 245.

The foreshadowed issue was squarely presented in Machinists. There, after a collective bargaining agreement had lapsed and the union and employer were negotiating a new agreement, the union adopted a resolution binding union members to refuse to work any overtime, as part of its strategy in the ongoing bargaining negotiations. 427 U.S. at 134. The employer filed a

charge with the NLRB, alleging that this resolution violated the NLRA; the NLRB dismissed the charge on the ground that the conduct was neither protected nor prohibited by the Act. Id. at 135. The employer then filed a complaint before a state agency, alleging that the resolution violated state law. Id. The state agency agreed with the employer and held that it could regulate this conduct as the NLRB had held it was neither protected nor prohibited under the NLRA. Id. at 135-36.

In Machinists, the state agency had essentially thrust itself into an ongoing collective bargaining negotiation. The Supreme Court reversed the state agency's determination. The Court noted that "the crucial inquiry regarding pre-emption is . . . whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" Id. at 147-48 (quoting Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 380 (1969)). The Court explained its rationale in broader terms than the actual test it created, that Congress intended certain conduct "be unregulated because [it was to be] left 'to be controlled by the free play of economic forces,'" even where such conduct was neither arguably protected nor arguably prohibited under the Act. Id. at 140 (quoting NLRB v. Nash-Finch Co., 404 U.S. 138, 144 (1971)). The Court stated that this limitation of state authority was a negative implication of the NLRA: "To

-10-

sanction state regulation of such economic pressure deemed by the federal Act 'desirabl[y] left for the free play of contending economic forces, is not merely [to fill] a gap [by] outlaw[ing] what federal law fails to outlaw; it is denying one party to an economic contest a weapon that Congress meant him to have available.'"   Id. at 150 (alterations in original) (quoting Lesnick, Preemption Reconsidered: The Apparent Reaffirmation of Garmon, 72 Colum. L. Rev. 469, 478 (1972)) (internal ellipses omitted).

Under Machinists, the Court has addressed whether a variety of state conduct is pre-empted by negative implication from the NLRA, although not in a case on all fours with this case.  For example, breach of contract actions brought by employees who were hired to replace striking workers against employers who promised them permanent employment are not pre-empted under the doctrine. Belknap, Inc. v. Hale, 463 U.S. 491, 500-07 (1983).  A law requiring group health plans to provide a minimum level of mental health protection, Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 729-31 (1985), and a law requiring certain employers who cease or relocate operations to provide severance payments to employees, Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 3-4 (1987), have also been upheld against Machinists challenges.

The Court has found other types of conduct which more directly involves the state in ongoing labor negotiations, strikes,

-11-

or labor actions to be pre-empted. In <u>Golden State Transit Corp.</u> v. <u>City of Los Angeles</u>, 475 U.S. 608, 619-20 (1986), the Court held that a city council's conditioning of a taxi cab franchise renewal on resolution of an ongoing labor dispute by a certain date, and consequent expiration of the franchise, was pre-empted. The <u>Golden State Transit</u> Court held that the labor dispute and the franchise renewal issue had become clearly intertwined. <u>Id.</u> at 610. The effect of the city council's action was to thwart the ongoing bargaining process by placing a time limit on the company's use of its economic power to withstand the strike. <u>Id.</u> at 615. This was a direct violation of Congress's intent that the city not use its licensing power to destroy the balance between union and management in the use of economic weapons. <u>Id.</u> at 619.

Most recently, in <u>Chamber of Commerce</u> v. <u>Brown</u>, 554 U.S. 60, 62 (2008), the Court held that a California law prohibiting certain employers that receive state funds from using such funds to assist, promote or deter union organizing was pre-empted, given the "explicit direction from Congress to leave noncoercive speech unregulated." <u>Id.</u> at 68. Further, the California statute exempted activities that promoted unionization. <u>Id.</u> at 63. Significantly, despite its statement of neutrality, the state law did not operate neutrally as to employers, who were forbidden from using these monies to influence the decisions of employees as to whether to join unions. <u>Id.</u> at 63, 71. It also established a "formidable"

enforcement scheme, created presumptions against employers, and permitted suit by the state attorney general and any private taxpayers.  Id. at 63-64, 72.  This meant that even "a trivial violation of the statute could give rise to substantial liability." Id. at 72.

On the other side of the equation, the Court found that the NLRA itself embodies a "First Amendment right of employers to engage in noncoercive speech about unionization." Id. at 67.  That Congressional judgment was reinforced with the enactment of the Labor Relations Act of 1947, 61 Stat. 136, 29 U.S.C. §§ 157-158, curtailing the power of even the NLRB to restrict such speech, Brown, 554 U.S. at 67.  Machinists pre-emption remains "based on the premise that 'Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes.'"  Id. at 65 (quoting Machinists, 427 U.S. at 140 n.4).[6]

---

[6]  The Court has addressed the doctrine in two other cases of little relevance to this appeal.  In New York Telephone Co. v. New York State Department of Labor, 440 U.S. 519 (1979), a fractured Court upheld a state law providing unemployment benefits to striking workers.  A majority suggested that the law would be pre-empted under Machinists, but found that the particular legislative history of the NLRA and the Social Security Act required finding that the law was not pre-empted.  Id. at 545-47, 551.
In Building & Construction Trades Council v. Associated Builders & Contractors, 507 U.S. 218, 227, 232-33 (1993), the Court held that the Machinists doctrine is applicable only when the state acts in its regulatory capacity, and does not apply when a state acts in its proprietary capacity as a market participant.

-13-

Plaintiffs sound three themes under Machinists. The first two are more closely related: (1) The Ordinance creates a major risk that a business which undergoes a change in identity under the Ordinance will trigger the NLRB's "successorship doctrine," whereby businesses deemed to be "successors" to prior businesses they have taken over are required to recognize and bargain with the union that represented the employees of the predecessor employer. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27 (1987). Because the Ordinance requires new employers to hire their predecessors' employees for three months, plaintiffs argue this makes it much more likely, or even certain, the NLRB will conclude an employer is a successor and required to bargain with any incumbent union; and (2) that the Ordinance accordingly improperly enhances the bargaining power of unions. The final claim is (3) that an employer has a "right" to make its own hiring decisions upon acquiring a new business and that right falls within the zone of conduct Congress intended to leave unregulated by the states. These claims are, to a degree, interrelated.[7]

---

[7] The pre-emption analysis under Machinists "is not affected by the fact that we are reviewing a city's actions rather than those of a State." Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 614 n.5 (1986).

1.      The NLRB Successorship Doctrine

Plaintiffs' primary Machinists claim involves the relationship of the Ordinance's three-month mandatory retention period to the NLRB's successorship doctrine.  This doctrine deals "with the issue of a successor employer's obligation to bargain with a union that had represented the employees of its predecessor."[8]  Fall River Dyeing, 482 U.S. at 36.  A finding of successorship imposes an obligation on the successor "to bargain with the union" of its predecessor.  Id. at 40.  However, even a successor "'is ordinarily free to set initial terms on which it will hire the employees of a predecessor,' and it is not bound by the substantive provisions of the predecessor's collective-bargaining agreement."[9]  Id. (quoting NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272, 294 (1972)) (internal citation omitted).

Under this doctrine, determining whether a new company is a successor "is primarily factual in nature and is based upon the

---

[8] The successorship doctrine is only relevant where the predecessor's employees were represented by a union.

[9] In some instances, where an employer is found to be a "perfectly clear" successor, it "must bargain with the employees' representative before it changes any terms to which its predecessor had agreed." S & F Mkt. St. Healthcare, LLC v. NLRB, 570 F.3d 354, 358 (D.C. Cir. 2009); see also NLRB v. Burns Int'l Sec. Servs., Inc., 406 U.S. 272, 294-95 (1972) ("[T]here will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.").

totality of the circumstances of a given situation." Id. at 43.

"[T]he focus is on whether there is 'substantial continuity' between the enterprises," and involves assessment of a variety of factors:

> whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers.

Id.

While the doctrinal test involves a multitude of factors, typically the new employer must "hire a majority of its employees from the predecessor" to be denominated a successor by the NLRB. Id. at 41; see also Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 263 (1974) (to find successorship requires finding "substantial continuity in the identity of the work force across the change in ownership").

Plaintiffs argue that because the Ordinance mandates retention of the predecessor's employees, and because the composition of the workforce is an important factor in determining whether a new employer is a "successor," the Ordinance has an impermissible impact on the successorship determination, and it is pre-empted under Machinists.

Plaintiffs' argument rests on two premises: (1) that if the NLRB reached such a conclusion, the state law would be pre-

-16-

empted, and (2) that the risk that the NLRB might adopt such a conclusion is, of itself, sufficient to render the Ordinance pre-empted. The first situation is not before us. The NLRB has not to date reached such a conclusion. This challenge necessarily rests on the second premise. We will assume arguendo that, at least in some circumstances, a strong risk of an NLRB decision could result in Machinists pre-emption, even though there is a presumption against pre-emption. See Bldg. & Constr. Trades Council v. Associated Builders & Contractors, 507 U.S. 218, 224 (1993) (explaining that the courts are "reluctant to infer pre-emption"). Even on that assumption, the degree of risk present here is insufficient to result in Machinists pre-emption.

There are two reasons for this. The first is that the Supreme Court caselaw on successorship stresses the voluntary and conscious decisionmaking by the new employer and the consequent effect on employees' views of their employment. The Supreme Court has explained that the successorship doctrine is based on the "conscious decision" of the new employer "to maintain generally the same business and to hire a majority of its employees from the predecessor." Fall River Dyeing, 482 U.S. at 41 (emphasis added). "This makes sense when one considers that the employer intends to take advantage of the trained work force of its predecessor." Id. Under the Ordinance, however, the new employer has made no such "conscious decision," nor has the employer "intend[ed] to take

-17-

advantage" of the work force.  Rather, it will have been compelled to continue the employment of the former business's employees, subject to conditions, for three months.  To the extent that employee expectations about continued employment are relevant, the fact that retention of employees is only for three months pursuant to the Ordinance may also weigh against a finding of successorship. See id. at 43.

Secondly, the NLRB has not to date clearly moved in the direction plaintiffs posit, and it is far from clear that it will. Indeed, the one NLRB administrative law judge (ALJ) to address this matter in depth, in an opinion which went unreviewed by the full board, reached a conclusion directly opposite to plaintiffs' hypothesis.  M&M Parkside Towers LLC, No. 29-CA-27720, 2007 WL 313429 (N.L.R.B. Jan. 30, 2007) (ALJ opinion).  There, the ALJ explained that, under a similar 90-day retention ordinance, the appropriate time to make the successorship determination was not when the employees were initially hired pursuant to the ordinance, nor at the end of the 90-day mandatory employment term, but rather on "the date that offers of employment are actually made, or if not made, at a reasonable time after the expiration of the 90 day period."  Id.

While the ALJ's opinion in M&M Parkside does not bind the agency, the NLRB's General Counsel (at least as of the date of M&M Parkside) has adopted a similar position: that the successorship

determination should be made at the end of the three-month retention period. Id.

It is true that a second ALJ addressed this question more than fifteen years ago in United States Services Industries, Inc., No. 5-CA-24575, 1995 WL 1918207 (N.L.R.B. Dec. 13, 1995) (ALJ opinion), and reached a different conclusion. The ALJ rejected the new employer's argument that Fall River Dyeing's discussion of a conscious decision to hire the employees had any impact on the successorship determination. U.S. Servs., 1995 WL 1918207. Instead, the ALJ held that "[b]ecause the Board has never formally adopted a requirement that a successor employer must consciously decide to avail itself of its predecessor's trained workforce in order to be considered a Burns' successor employer," the fact that the hiring was pursuant to a compulsory retention ordinance (similar to the one at issue in this case) did not alter the application of the successorship doctrine. Id. This opinion is of little value with respect to predicting how the NLRB might resolve the successorship question. The opinion treated the issue only briefly, and based its decision on the fact that the Board had not explicitly addressed this type of ordinance. Moreover, the position adopted there has not been followed by either the NLRB's General Counsel or the more thoroughly reasoned M&M Parkside opinion. As a result, United States Services Industries sheds little light on the position the Board might ultimately adopt and

-19-

reflects a view of law that is far less current than the M&M Parkside opinion.

Nevertheless, it is possible that the NLRB, in exercising its "considerable authority to interpret the provisions of the NLRA," Fall River Dyeing, 482 U.S. at 42, might adopt another rule, causing the Ordinance to have a dramatic impact on the successorship determination.[10] Cf. Sahara Las Vegas Corp., 284 N.L.R.B. 337, 343 (1987) (concluding that a 90-day probationary period "unilaterally imposed" by the new employer "has no legally cognizable significance" on the successorship determination); see generally Garmon, 359 U.S. at 245-46 (explaining that the Board might decide that conduct is protected by the NLRA, prohibited under the Act, "neither protected nor prohibited," or even "fail to determine the status of the disputed conduct").

The remedy for such a determination, if it should ever be made, does not lie in this pre-enforcement suit. Nothing would prohibit a successor from raising the pre-emption question in an appeal from the NLRB successorship determination based on the involuntary continuation of employment under the Ordinance or in a

---

[10] If we are wrong, and the NLRB decides otherwise, this opinion does not limit the putative "successor's" ability to raise defenses to enforcement. At oral argument, the defendant recognized that in such a circumstance, the Ordinance would probably be pre-empted under the NLRA, and plaintiffs acknowledged that if the NLRB were to impose successorship obligations on a company that retained workers solely because of the Ordinance, such a company could raise pre-emption arguments as a defense to any enforcement action.

state court action[11] enforcing the Ordinance. Indeed, the latter situation is the most usual format in which Machinists issues have been resolved. See Fort Halifax, 482 U.S. at 5-6 (appeal from state court enforcement of severance pay statute); Metro. Life, 471 U.S. at 734-38 (appeal from state court action seeking declaratory and injunctive enforcement of state law); Belknap, 463 U.S. at 496-97 (appeal from state breach of contract judgment); Machinists, 427 U.S. at 135-36 (appeal from state commission cease and desist order).

Alternatively, a new action for declaratory relief regarding the Ordinance could be brought in federal court, should the NLRB do what plaintiffs fear. See Brown, 554 U.S. at 64-65 (suit requesting injunctive relief preventing state statute's enforcement); Golden State Transit, 475 U.S. at 611-13 (declaratory action challenging city's intervention in labor dispute); N.Y. Tel. Co. v. N.Y. State Dep't of Labor, 440 U.S. 519, 525-27 (1979) (declaratory action challenging unemployment benefits provided to striking workers).

As a result, in this request for pre-enforcement declaratory relief, we are unable to conclude that the Ordinance "would frustrate effective implementation of the Act's processes"

_____

[11] State courts have the ability to adjudicate the defense of pre-emption. See Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 393 (1986) ("[W]hen a claim of Garmon pre-emption is raised, it must be considered and resolved by the state court.").

with respect to the successorship determination.  <u>Machinists</u>, 427

U.S. at 148 (quoting <u>R.R. Trainmen</u>, 394 U.S. at 380) (internal

quotation marks omitted); <u>see</u> <u>also</u> <u>Livadas</u> v. <u>Bradshaw</u>, 512 U.S.

107, 119 (1994) (explaining that NLRA pre-emption analysis "turns

on the actual content" of the state policy and "its real effect on

federal rights").[12]  The cases in which the Court found <u>Machinists</u>

pre-emption presented far stronger facts than here.

---

[12]  There are also uncertainties with respect to how the Ordinance might be interpreted and applied in certain instances, which are not before us.  For example, it is not entirely clear how the Ordinance would apply in the hypothetical instance of a purchaser who, upon purchasing a hotel, immediately ceases all operations for a period of time exceeding three months to renovate the property.

The Ordinance provides that the three-month retention period begins "after the commencement of operation of the hospitality business under the new hospitality business employer." Providence, R.I., Code § 2-18.5(c)(1).  The Ordinance does not define "commencement of operation."  It seems unlikely that a new employer would be required to retain workers during the renovation period, as either the employer would not have "commenced" operations, or if it were deemed to have commenced operations, the provision of the Ordinance allowing it to discharge employees if "fewer are required for its full operation than were required by the previous hospitality business employer" would likely apply, as the "full operation" at the time would simply be the renovation project.

However, it is unclear whether in such a circumstance the new employer would not be required to retain the employees at all, or would be obligated to retain them for three months once renovation activities ceased.  This is a question of interpretation of local law for the state courts.  Any pre-emption issues arising from such an interpretation can be addressed should such an interpretation be made.

2.     The Claim That Employees Are Given Benefits For
       Which They Would Otherwise Have Had To Bargain

Plaintiffs' second Machinists claim is that, by providing the employees with benefits for which they otherwise would have had to bargain, the Ordinance impermissibly enhances employee and union bargaining power, rendering it pre-empted. This particular logic was rejected by the Supreme Court in Metropolitan Life Insurance Co. v. Massachusetts, 471 U.S. 724 (1985), and Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987), and we reject it here.

The Court in Fort Halifax rejected a Machinists challenge to a Maine law requiring certain employers to provide severance pay to employees when the employer relocated or ceased operations. The Court explained that:

> It is true that the Maine statute gives employees something for which they otherwise might have to bargain. That is true, however, with regard to any state law that substantively regulates employment conditions. Both employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations.

Fort Halifax, 482 U.S at 21 (quoting Metro. Life, 471 U.S. at 757).

The Court concluded by holding that "the mere fact that a state statute pertains to matter over which the parties are free to bargain cannot support a claim of pre-emption." Id. The

plaintiffs' argument provides no basis to distinguish this case from Fort Halifax.[13]

It is true that the Court in Metropolitan Life and Fort Halifax upheld what it characterized as "[m]inimum state labor standards" that were "not inconsistent with the general legislative goals of the NLRA." Metro. Life, 471 U.S. at 755, 757. There may be an outer boundary beyond which a state law can no longer be deemed a "minimum labor standard," and there may be certain minimum labor standards that are inconsistent with the goals of the NLRA. The Supreme Court has not indicated what differentiates a "minimum labor standard" from other labor standards, nor has it explained why such standards are by virtue of that status not usually inconsistent with the goals of the NLRA. It is far from clear that use of the phrase helps achieve clarity as to the boundaries of permissible state regulation.

Nevertheless, plaintiffs have not shown that the Ordinance exceeds the permissible bounds established by Fort Halifax and Metropolitan Life.[14] We assess this issue in light of

---

[13] This argument is distinct from the argument we have already rejected that the Ordinance is pre-empted because of the risk it may assist unions under the successorship doctrine.

[14] We do not comment on the district court's view that the Ordinance "cannot be simply characterized as a 'minimum labor standard.'" R.I. Hospitality Ass'n v. City of Providence, 775 F. Supp. 2d 416, 433 (D.R.I. 2011). It is unclear when, if ever, a state law that is not a "minimum labor standard" can survive Machinists, but we need not address that question in this case.

-24-

the Court's admonition that "pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." Fort Halifax, 482 U.S. at 21; see also Metro. Life, 471 U.S. at 756 ("States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." (quoting DeCanas v. Bica, 424 U.S. 351, 356 (1976)) (internal quotation mark omitted)). Given this, if it is permissible to require certain employers to provide severance pay to employees, as in Fort Halifax, it is difficult to see why it would be impermissible to require purchasers of hotel businesses to retain employees for three months, under the terms and conditions the new employer sets. While the Ordinance is not completely analogous to the law at issue in Fort Halifax, Plaintiffs do not identify any distinction between the provisions of the Ordinance and the mandatory severance payments upheld in Fort Halifax sufficient to render the Ordinance pre-empted under Machinists.[15]

_____

[15] This case does not require us to assess a state law that applies "to only one occupation . . . in one industry . . . in one county," which one other circuit has held to be such a specific regulation that it cannot be characterized as a permissible minimum labor standard of general applicability. 520 S. Mich. Ave. Assocs. v. Shannon, 549 F.3d 1119, 1130 (7th Cir. 2008). The Ordinance here affects the entire hotel industry in Providence, with the exception of any instrumentality of the state of Rhode Island and facilities connected to the Providence Place Mall, and applies to "any person employed to perform any services" by a hotel, or its component entities, who was employed for at least two months by the hotel. Providence, R.I., Code § 2-18.5(b), (c). That a state law only regulates one industry is an insufficient basis to render it

-25-

### 3.   The "Right" to Hire and Fire

Plaintiffs next contend that the Machinists doctrine protects a new employer's "right" to make its own determinations of both which employees to hire and to fire, and that state laws cannot interfere with this "right."

It is important to note the context in which plaintiffs' challenge is raised.  The Ordinance does not impose an absolute limitation on an employer's ability to hire or to fire.  Rather, it imposes a limited requirement that a new employer retain for three months those of its predecessor's employees with at least two months' employment, after which the Ordinance no longer imposes obligations.  Even during the three-month period, the Ordinance allows the new employer to (1) set the terms and conditions of employment, (2) discharge employees for good cause, and (3) discharge employees if fewer are needed for its full operation.  Still, it does impose restrictions which may well otherwise not exist.

The resulting impact on the hiring and firing decisions of new employers will vary with circumstances and individual facts.

---

pre-empted under Machinists.  See Associated Builders & Contractors v. Nunn, 356 F.3d 979, 990 (9th Cir. 2004) ("[T]he NLRA does not authorize us to pre-empt minimum labor standards simply because they are applicable only to . . . a particular industry.").  In addition, the fact that the city, rather than the state, regulates this industry lessens Shannon's concern that "by regulating only one county the state makes it possible to target union heavy counties (or union-light counties), and thus reward (or punish) union activity."  549 F.3d at 1133.

Some of the retained employees will choose not to stay in light of any new terms and conditions of employment, or even the prospect of new management. Of those who choose to stay, it is likely some will have been at-will employees who can under the Ordinance be terminated only for good cause. The employees, however, may already have individual contracts or collective bargaining contracts giving them greater protections than at-will employees. And some new management as a matter of their own choice might choose regardless of the Ordinance to ensure continuity by retaining employees and/or discharging employees only for good cause during this period. At this pre-enforcement stage there is no data on the Ordinance's actual effect on new employers' decisions. In this factual context, plaintiffs' assertion is unsupported.

Plaintiffs' argument that there is a "right not to hire" largely relies on two carefully chosen quotes from the Supreme Court's precedent in the successorship context. In Howard Johnson Co. v. Detroit Local Joint Executive Board, 417 U.S. 249 (1974), the Court remarked that Burns, 406 U.S. 272, the Court's first successorship case, "establishes that Howard Johnson had the right not to hire any of the former Grissom employees, if it so desired." Howard Johnson, 417 U.S. at 262. And in Fall River Dyeing, the Court, again citing to Burns, explained that "the successor is under no obligation to hire the employees of its predecessor,

-27-

subject, of course, to the restriction that it not discriminate against union employees in its hiring." 482 U.S. at 40.

These cases do not support plaintiffs' argument that there is a "right" protected under Machinists for a new employer to make independent hiring or termination determinations, much less that any such "right," if it existed, would be impaired by compliance with the Ordinance. Rather, the statements simply indicated that, as a matter of federal labor law, the new employers were not compelled by the successorship doctrine to hire their predecessor's employees. Plaintiffs do not claim that this is a right grounded in the Constitution like the First Amendment right at issue in Brown, nor that the NLRB has recognized such a general right to hire and fire. Rather, they attempt to derive such a "right" from the language in Supreme Court opinions.

The language in the Burns opinion makes it clear that the Court was not establishing a Machinists protected right to hire new employees, but rather simply noted that the NLRB "has never held that the [NLRA] itself requires that an employer . . . hire all of the employees of the predecessor . . . ." Burns, 406 U.S. at 280 n.5 (emphasis added). Similarly, the Court in Howard Johnson explained Burns as remarking that "nothing in the federal labor laws 'requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be

assumed by the employer.'"  Howard Johnson, 417 U.S. at 261

(alteration in original) (quoting Burns, 406 U.S. at 280 n.5)

(emphasis added).

None of these cases purported to resolve any question remotely similar to the argument advanced by plaintiffs here: that the NLRA pre-empts state regulation mandating in limited circumstances the hiring, subject to several conditions, of a previous employer's employees by a new employer.  Nothing in the Court's Machinists line of cases establishes such pre-emption nor do plaintiffs point to any authority outside of the isolated statements discussed above as indicating that the NLRA was designed to pre-empt such regulation.

It is true there is no Supreme Court Machinists case just like this one.  Still, to the extent that the NLRA has touched on employers' hiring and firing abilities, it has largely limited them.  Instead it has created rights in individuals as to employment and discharge.[16]  One good example is the prohibition of

---

[16]  The legislative history of the NLRA, which touches briefly on the  authority of an employer to make hiring decisions, does not support plaintiffs' argument.  In connection with the prohibition on discriminatory hiring located in section 8(a) of the Act, the history notes that "[n]othing in this subsection prohibits interference with the normal right of employers to select their employees or to discharge them."  H.R. Rep. No. 74-969, at 17 (1935); H.R. Rep. No. 74-972, at 17 (1935); H.R. Rep. No. 74-1147, at 19 (1935).  This language was reiterated in NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45 (1937), which explained that "[t]he act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them."
This language does not indicate that the Act establishes

discrimination based on union status.  See 29 U.S.C. § 158(a)(3) (making it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment" with respect to union status); cf. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46 (1937) ("The [NLRA] has been criticized as one-sided in its application; that it subjects the employer to supervision and restraint and leaves untouched the abuses for which employees may be responsible . . . .").

The Ordinance is also not pre-empted when viewed as a restriction on the ability of an employer to discharge certain employees.  As noted above, the restriction is limited, in that it only applies for three months, and during that time employers may still discharge employees for good cause.  The limited duration of the Ordinance, its conditions allowing discharge, and the ability

_____

any "right" with respect to selection of employees.  As there was no previous general federal regulation of the employment relationship, the "right" referred to could have been grounded in either (1) the federal constitution, specifically the Due Process Clause, or (2) generally extant state law.  The former theory -- that the Due Process Clause prohibits state regulation of the employment relationship -- has since been firmly rejected by the Supreme Court.  See Lincoln Fed. Labor Union v. Nw. Iron & Metal Co., 335 U.S. 525, 533-37 (1949) (explaining the history of the use of the Due Process Clause to invalidate employment regulations, that beginning in 1934 the Court began to reject this theory, that the theory has since been "deliberately discarded", and holding that a state law prohibiting discrimination in hiring with respect to a prospective employee's union or non-union status is not invalid under the Due Process Clause); see also Cal. Grocers Ass'n v. City of Los Angeles, 254 P.3d 1019, 1033-34 (Cal. 2011) (rejecting the argument that "the NLRA was founded on and assumes an employer's unfettered right to select its employees").

-30-

of employers to set the terms and conditions of employment are important to our analysis. We do note that restrictions on the ability to fire have been upheld against Machinists claims as permissible labor standards by another circuit. See St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands, 218 F.3d 232, 246 (3d Cir. 2000) (holding Virgin Islands law that restricted the permissible grounds on which employees could be discharged is not pre-empted).[17] And it is not uncommon for states to limit discharge of employees to preclude retaliation for protected activities as a ground for discharge.[18] One jurisdiction, at least, requires payment of certain sums to employees discharged without good cause. See Soto v. State Indus. Prods., Inc., 642 F.3d 67, 74-75 (1st Cir. 2011) (explaining that Puerto Rico's Law 80 requires that an employer pay severance pay to every employee who is "discharged . . . without just cause").

---

[17]  Barnes v. Stone Container Corp., 942 F.2d 689 (9th Cir. 1991), is not to the contrary. There, the court did not address whether a Montana law imposing a good cause standard for discharge was itself pre-empted; instead, it assessed whether an employee could bring an implied contract action based on the statute during an impasse in employer-union bargaining, and held that the employee's "action [was] preempted by the NLRA." Id. at 690, 693.

[18]  At least one circuit has upheld such a law against a Machinists pre-emption claim. See Peabody Galion v. A.V. Dollar, 666 F.2d 1309, 1316 (10th Cir. 1981) (holding Oklahoma law that prohibits discharge of an employee in retaliation for the employee filing a workers' compensation claim is not pre-empted).

-31-

B.        *Garmon* Pre-emption

Under the Garmon pre-emption doctrine, "States may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits." Gould, 475 U.S. at 286.[19]

Garmon "prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." Id. When assessing Garmon pre-emption, "[f]irst, we determine whether the conduct that the state seeks to regulate or to make the basis of liability is actually or arguably protected or prohibited by the NLRA." Local 926, Int'l Union of Operating Eng'rs v. Jones, 460 U.S. 669, 676 (1983). "[I]f the conduct at issue is arguably prohibited or protected . . . . state law and procedures are ordinarily pre-empted." Id.

Still, there are exceptions where pre-emption will not be found. Garmon "does not pre-empt 'all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously much of this is

---

[19] The Supreme Court has explained that the term "protected" in the NLRA pre-emption context can refer to two "quite different concepts" -- conduct that cannot be regulated because it is "covered by" the NLRA, which is the focus of Garmon pre-emption, and "conduct which a State may not prohibit even though it is not covered by" the NLRA, which is the focus of Machinists pre-emption. Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters, 436 U.S. 180, 199 n.30 (1978).

left to the States.'" Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 392 (1986) (quoting Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 289 (1971)). Thus, when a matter is "a merely peripheral concern of the [NLRA]," or "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that congress had deprived the States of the power to act," the state law is not pre-empted. Id. (quoting Garmon, 359 U.S. at 243-44) (internal quotation marks omitted).

The burden is on the "party asserting pre-emption" to make an "affirmative showing that the activity is arguably subject to the Act." Id. at 399. Plaintiffs raise several arguments invoking Garmon pre-emption, but ultimately fail to make such an "affirmative showing."[20]

### 1. Regulating Mandatory Subjects of Bargaining

Plaintiffs' primary contention regarding Garmon pre-emption is that, because the Ordinance regulates a mandatory subject of bargaining, it interferes with conduct protected by the

---

[20] The district court did not evaluate the Garmon claims, but this does not affect our ability to assess them on appeal. "Although the district court did not address this issue, we are free to resolve questions of law in the first instance." Robidoux v. Muholland, 642 F.3d 20, 23 n.2 (1st Cir. 2011) (citing Gately v. Massachusetts, 2 F.3d 1221, 1228 n.4 (1st Cir. 1993)). The pre-emption question is "predominantly legal" in nature. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983).

NLRA and is thus pre-empted. Plaintiffs assert that because the obligation to hire, the right of an employer to subcontract, and the existence of a good cause termination standard are all mandatory subjects of bargaining, a state law that impacts these terms is invalid under Garmon.

Plaintiffs' argument misses the mark. As an initial matter, it is clear that states can, and do, regulate numerous subjects that the NLRB has held to be mandatory subjects of bargaining. The NLRA itself requires bargaining between an employer and the union representative over "wages, hours, and other terms and conditions of employment," 29 U.S.C. § 158(d), rendering them mandatory subjects of bargaining, First Nat'l Maint. Corp. v. NLRB, 452 U.S. 666, 674 (1981) (explaining that wages and hours are mandatory subjects of bargaining). Nevertheless, there is no question that states can set minimum wage laws and impose maximum working hour limitations. See Metro. Life, 471 U.S. at 755-57 (explaining that minimum state labor standards that "neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA" are not pre-empted).

Moreover, the Supreme Court has rejected this type of argument in the context of severance pay. It is clear that severance pay is a subject of mandatory bargaining. See, e.g., First Nat'l, 452 U.S. at 677 n.15 (explaining that "[t]here is no doubt that" employers are "under a duty to bargain about the

results or effects of its decision" to shut down a plant, including severance pay); Yorke v. NLRB, 709 F.2d 1138, 1143 (7th Cir. 1983) (explaining that there is a "duty to bargain over the effects of a decision to terminate operations," including "severance pay"); Borden, Inc., 279 N.L.R.B. 396, 396, 398 (1986) (holding that the employer was required to "bargain over the severance pay issue"); NLRB General Counsel Memo, No. 25-CA-15237, 1983 NLRB GCM LEXIS 52, at *4 (June 30, 1983) ("It is well settled that severance pay, insurance, and pension benefits for current employees are mandatory subjects of bargaining . . . ."). Nevertheless, the Supreme Court found "no support" for a Garmon pre-emption argument with respect to a Maine statute mandating severance pay for certain plant closings. Fort Halifax, 482 U.S. at 22 n.16.

Imposing a minimum standard for a subject that is a mandatory subject of bargaining is not the same as regulating "conduct subject to regulation by the [NLRB]," which is the inquiry relevant to Garmon pre-emption. Id.; see also Brown, 554 U.S. at 69 ("In NLRA pre-emption cases, 'judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted.'" (quoting Golden State Transit, 475 U.S. at 614 n.5)).

Here, the conduct the Ordinance regulates is the retention and firing of employees when there is a change in employer identity. The only regulation of an employer's ability to

hire and fire in the NLRA is a provision forbidding the employer from discriminating "in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization," 29 U.S.C. § 158(a)(3), a provision not implicated by the Ordinance.[21]  Plaintiffs point to no other authority expanding or limiting employers' power to hire or fire under the NLRA.  Even though the word "arguably" in the Garmon assessment is broad, it is "not without substance," "is not satisfied by a conclusory assertion of pre-emption," and "the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor."  Davis, 476 U.S. at 394-95.  No such demonstration was made in this case.

Because the NLRA does not itself protect an employer's ability to hire or fire, and indeed regulates it, such conduct is not arguably protected or arguably prohibited, and thus the Ordinance is not pre-empted under Garmon for altering those aspects

---

[21]  Plaintiffs cite two cases holding that state laws compelling new employers to adopt the collective bargaining agreements of their predecessors are pre-empted.  See Commonwealth Edison Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 15, 961 F. Supp. 1169 (N.D. Ill. 1997); United Steelworkers v. St. Gabriel's Hosp., 871 F. Supp. 335 (D. Minn. 1994).  These cases are readily distinguishable, as they addressed conduct protected by the NLRA.  In those cases, the states were attempting to compel agreement to a collective bargaining agreement, directly violating the NLRA's directive that the obligation to bargain in good faith "does not compel either party to agree to a proposal."  29 U.S.C. § 158(d); see also Golden State Transit, 475 U.S. at 616 (explaining that the NLRA "does not require [the employer and the union] to reach agreement").

of the employment relationship.  See Wash. Serv. Contractors, 54 F.3d at 816 ("The 'terms' of the [ordinance] do not 'encompass' any matter even arguably regulated by § 8 of the NLRA."); Cal. Grocers Ass'n, 254 P.3d at 1030 ("On the subject of employee hiring and firing, the text of the NLRA is, with one notable exception, resoundingly silent.").

Our decision here accords with our decision in Beckwith v. United Parcel Service, Inc., 889 F.2d 344 (1st Cir. 1989), where we rejected a Garmon challenge to a Maine law prohibiting employers from satisfying claims against employees through payroll deductions required as a condition of employment because "the 'conduct' that Maine seeks to regulate -- execution of agreements providing for payroll deductions as a condition of employment -- is not subject to the regulatory jurisdiction of the NLRB."  Id. at 347.

2.  Other *Garmon* Claims

Plaintiffs raise several other claims that the Ordinance runs afoul of the Garmon doctrine; none of these arguments suffices to render the Ordinance pre-empted.

First, plaintiffs make a bald assertion that the Ordinance somehow restricts the ability of employees to choose their bargaining representative, in violation of Section 7 of the NLRA.  Plaintiffs, however, do not explain how the Ordinance, which

by its terms has no such effect, imposes such a restriction.[22]  This argument is waived.  Even if not waived, this "conclusory assertion of pre-emption" does not suffice.  Davis, 476 U.S. at 394.  Other similar concerns, such as the Ordinance's impact on the Section 7 rights of non-union workplace employees, may also exist, but are also not raised by plaintiffs.  In any event, at this juncture such concerns are hypothetical; such pre-emption claims can be made by appropriate plaintiffs if and when they materialize.

Second, plaintiffs contend that the Ordinance functionally effects a three-month suspension of federal labor law, reasoning that, as to new employers in unionized hotels, if the successorship determination is not made immediately, it is unclear what the status of the employee's bargaining representative is.[23]

Plaintiffs are correct in noting that if the successorship determination is made only after the three-month period elapses, it is unclear whether the new employer will ultimately have to bargain with the predecessor union's bargaining representative.  However, this issue is not uncommon in

_____

[22]  Plaintiffs make no argument about and do not attempt to assert the interests of non-unionized employees who do not wish to be unionized.

[23]  Plaintiffs also mention that the Ordinance makes unclear what happens if a representation petition is filed with the NLRB during the three-month period.  This argument contains no analysis and is waived.  United States v. De Jesús-Viera, No. 10-1365, 2011 WL 3688997, at *7 n.4 (1st Cir. Aug. 24, 2011) (arguments raised "in a cursory fashion" are waived).

successorship cases and not a basis for pre-emption. In Fall River Dyeing, the Court held that, even when an employer is found to be a successor, the duty to bargain with the bargaining representative of the employees only attaches when "a substantial and representative complement" of the employees has been hired, and the union has made a demand for bargaining. 482 U.S at 47, 52. In addition, it is far from clear the NLRB would impose a duty to bargain during the three-month period, for the reasons we gave earlier.[24]

Third, plaintiffs argue that the Ordinance's attempt to avoid pre-emption through its preservation of rights section, which provides that "[n]o provision of this Ordinance shall be construed to impair, prohibit, or provide for any right of recovery for, that lawful exercise of employees' or employers' right to engage in strike or lockout," Providence, R.I., Code § 2-18.5(d)(1), itself creates a conflict with the NLRA, as it would involve state court interpretation of the scope of those federally protected rights. Plaintiffs do not explain how the Ordinance itself would interfere

---

[24] It is true that "[a]s a general rule, the relevant measuring day to determine if the Company employed a majority of union members is the initial date it began operating," with the exception of instances "when an employer starts with a few employees and requires a startup period." Vt. Foundry Co., 292 N.L.R.B. 1003, 1009 (1989). However, the NLRB has "recognized that a successor's obligation to recognize and bargain with an incumbent will vary with the circumstances of each case," and that "special circumstances" might "warrant[] the postponement of that obligation." Sahara Las Vegas Corp., 284 N.L.R.B. 337, 343 (1987).

with the NLRA rights of lockout or strike.  We do not see how a provision designed to avoid state law interference with federally protected rights would, of itself, give rise to pre-emption.

Fourth, plaintiffs argue that because the remedies for violations of the Ordinance -- specifically, backpay, treble damages, and attorneys' fees -- are greater than those provided by the NLRA, the Ordinance is pre-empted.  It is true that "supplemental sanction[s]" imposed by states on conduct arguably protected or prohibited by the NLRA are impermissible and are thus pre-empted.  See Gould, 475 U.S. at 289 (supplemental sanctions problem arises when "two separate remedies are brought to bear on the same activity" (emphasis added) (quoting Garner v. Teamsters, 346 U.S. 485, 498-99 (1953)) (internal quotation marks omitted)).  However, as discussed above, plaintiffs have not demonstrated that the Ordinance bears on arguably protected or prohibited conducted under the NLRA.  Thus the remedies the Ordinance adopts do not, of themselves, render it pre-empted, nor are the remedies extreme.[25]

---

[25] There are instances where sanctions imposed "for noncompliance with an otherwise valid state regulation" may be pre-empted; for instance, the issuance of injunctions preventing a union from functioning.  Brown v. Hotel & Rest. Emps., 468 U.S. 491, 510 (1984).  The forms of relief the Ordinance provides, however, do not raise this concern in this suit.  And this case is unlike Chamber of Commerce v. Brown, 554 U.S. 60 (2008), where there were substantial penalties for failure to comply with bookkeeping requirements.  Id. at 72.

-40-

C.          Plaintiffs' Remaining Claims

Plaintiffs raise two final challenges to the validity of the Ordinance: that it violates the Equal Protection Clause and the Contract Clause.  These are not serious challenges.

The Ordinance does not classify according to suspect lines or infringe on fundamental rights, and thus "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993).  Plaintiffs bear the burden of demonstrating that the Ordinance is invalid.  Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001).

Plaintiffs' argument is that the Ordinance impermissibly distinguishes between hotels and other tourism-related industries, and between hotels within and outside of Providence.  Plausible justifications, however, exist for both of these distinctions.  The preamble to the Ordinance itself explains the City's concern with hotels, as opposed to other parts of the tourism industry, and the parties stipulated that Providence accounts for a substantial share (28.4 percent) of the tourism spending in the state.  Moreover, the City's legislative body is entitled to "leeway to approach a perceived problem incrementally."  Beach Commc'ns, 508 U.S. at 316.  As a result, plaintiffs have not met their burden of demonstrating that the Ordinance is invalid.  See Cal. Grocers Ass'n, 254 P.3d at

1038-39 (rejecting equal protection challenge to similar ordinance).

To assess whether there is a violation of the Contract Clause, "we first ask whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'" Gen. Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978)). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether that impairment is substantial." Id. If all three components are satisfied, the question is whether "the impairment is nonetheless justified as 'reasonable and necessary to serve an important public purpose.'" Parella v. Ret. Bd. of the R.I. Emps. Ret. Sys., 173 F.3d 46, 59 (1st Cir. 1999) (quoting U.S. Trust Co. v. New Jersey, 431 U.S. 1, 25 (1977)).

Plaintiffs point to the collective bargaining agreement between the Westin Providence and Local 217-Unite Here as being impaired by the Ordinance. The only provision they claim is impaired by the Ordinance regards subcontracting and states: "the Employer will not subcontract out any work currently being performed by members of the bargaining unit without first negotiating said subcontract with the Union." If such negotiations fail, the parties are to "bargain as to the effects of the decision."

Plaintiffs do not explain how this provision is impaired, much less substantially impaired, by the Ordinance. They are still capable of subcontracting out work under the Ordinance, although the subcontractor might be obligated to hire the previous employees for a three-month period. The terms of the subcontracting provision remain fully operative under the Ordinance. Plaintiffs do not explain how the Ordinance "derogate[s] from substantial contractual rights," Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 431 (1934), and their Contract Clause claim thus fails.

IV.

Whether or not this ordinance will in fact protect and enhance tourism in Providence, its stated purpose, is far from clear. The City has leeway to experiment so long as it does not run afoul of federal labor policy and pre-emption under the United States Constitution. At this stage we cannot say it has. See Livadas, 512 U.S. at 120 ("In labor pre-emption cases, as in others under the Supremacy Clause, our office is not to pass judgment on the reasonableness of state policy . . . . It is instead to decide if a state rule conflicts with or otherwise 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal law." (quoting Brown v. Hotel & Rest. Emps., 468 U.S. 491, 501 (1984))).

We affirm the entry of judgment for the City and award costs to the City.

**-Concurring Opinion Follows-**

**STAHL**, <u>Circuit Judge</u>, **concurring**.  In my opinion, this Ordinance will do little to accomplish its stated purpose of protecting and promoting tourism in the City of Providence.  In fact, I fear that the Ordinance, which interferes with an employer's ability to make hiring and firing decisions in the critical first three months of its operations, will negatively affect Providence's tourism industry by deterring companies from doing business in the City.[26]  But our task in this case, as the majority emphasizes at the conclusion of its opinion, is not to pass judgment on the reasonableness of the Ordinance as a policy.  See <u>Livadas</u> v. <u>Bradshaw</u>, 512 U.S. 107, 120 (1994).  Rather, we must decide whether the Ordinance conflicts with federal law.  <u>Id.</u>  I join the majority's opinion because Plaintiffs have not convinced me that the Ordinance is preempted by the NLRA under existing case law.  Because I would take a different path to reach the majority's conclusion, however, I write separately.

I begin by noting that Plaintiffs' claims under the <u>Garmon</u> preemption doctrine, the Contracts Clause, and the Equal Protection Clause are largely without merit, and I join the majority's opinion as to those claims.  The fundamental issue here is whether the Ordinance is preempted under the <u>Machinists</u>

---

[26] Indeed, Plaintiffs have alleged that the Ordinance has already constrained their efforts "to attract vendors who may be able to provide hotel and restaurant services in a more efficient and cost-effective manner."

preemption doctrine. See Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp. Relations Comm'n, 427 U.S. 132 (1976).

The Machinists doctrine has come to apply when a court can discern, from the text or structure of the NLRA, that Congress intended to leave a subject free from state or local regulation. Cal. Grocers Ass'n v. City of Los Angeles, 254 P.3d 1019, 1027 (Cal. 2011). In practice, the cases in which the Supreme Court has found Machinists preemption thus far have involved states or localities attempting to actively intervene in the union organizing or collective bargaining processes. See Machinists, 427 U.S. 132 (finding preempted a state's act of enjoining union members from refusing to work overtime); Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608 (1986) (finding preempted a city council's conditioning of a franchise renewal on the resolution of an ongoing labor dispute); Chamber of Commerce v. Brown, 554 U.S. 60, 68 (2008) (finding preempted a state's attempt to regulate speech about union organizing, despite an "explicit direction from Congress to leave noncoercive speech unregulated").

On the other hand, there are two cases of relevance here in which the Supreme Court has declined to find Machinists preemption. Both cases involved state or local laws that regulated particular terms of the employment relationship itself; the Court found these regulations to be permissible "minimum labor standards." See Metro. Life Ins. Co. v. Massachusetts, 471 U.S.

-46-

724 (1985) (upholding a Massachusetts law requiring that employee health care plans include certain minimum mental health benefits); Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987) (upholding a Maine law guaranteeing employees severance payments in the event of a plant closing).  Reasoning that the goal of the NLRA is to regulate the process by which parties negotiate an employment agreement and not the substance of the agreement itself, Metro. Life, 471 U.S. at 753, the Court has sanctioned state and local regulations that impose "minimal substantive requirements on contract terms," id. at 754.  Such minimum labor standards are a lawful exercise of a state's authority "to regulate the employment relationship to protect workers within the State."  DeCanas v. Bica, 424 U.S. 351, 356 (1976).

Against that legal backdrop, Plaintiffs have alleged that the Ordinance is preempted under Machinists because it interferes with the goals of the NLRA by: (1) making it more likely that a new employer will be deemed a successor; (2) enhancing the bargaining power of unions by giving employees benefits for which they would otherwise have had to bargain; and (3) limiting an employer's right to hire and fire.  I will address each argument in turn.

1.    Successorship

First, Plaintiffs argue that the Ordinance impermissibly increases the chances that a new employer inheriting a unionized workforce under the Ordinance will be deemed a "successor" and thus

forced to recognize and bargain with the union representing its predecessor's employees. See Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27 (1987). I believe that the majority has properly analyzed the successorship issue and have little to add on this point. Under the reasoning of Fall River Dyeing and M&M Parkside Towers LLC, No. 29-CA-27720, 2007 WL 313429 (N.L.R.B. Jan. 30, 2007) (ALJ opinion), the NLRB should not find that successorship attaches to an employer affected by the Ordinance who takes over a unionized workforce. Should the NLRB find otherwise, Defendants conceded at oral argument that the Ordinance would likely be preempted, and the employer would have a cause of action in state or federal court, which I believe would be successful. Plaintiffs' second and third arguments, however, seem to me to present closer questions.

## 2. Bargaining Power

Plaintiffs' next argument is that the Ordinance interferes with the collective bargaining process by skewing the balance of power in favor of employees. Specifically, Plaintiffs argue that the Ordinance grants retained employees a right for which they would otherwise have had to bargain: three months of good cause employment.[27] It does seem indisputable that many

_____

[27] Plaintiffs also argue that the Ordinance disrupts the balance of power between employer and employees by making it more likely that a new employer will be deemed a successor and by constraining the new employer's ability to use the economic weapon of lockout. Because I do not believe that a new employer

employees will receive a benefit from the Ordinance for which they would otherwise have had to bargain. That alone, however, does not suffice to support a claim of preemption, "for there is nothing in the NLRA which expressly forecloses all state regulatory power with respect to those issues that may be the subject of collective bargaining." Fort Halifax, 482 U.S. at 21-22 (citation and internal quotation marks omitted). The question is therefore whether, as Plaintiffs claim, the Ordinance has "entered into the substantive aspects of the bargaining process to an extent Congress has not countenanced." Machinists, 427 U.S. at 149 (citation and internal quotation marks omitted).

This case is certainly distinguishable from Machinists, Golden State, and Brown, in which the Supreme Court found preemption because a state or locality had directly intervened in an ongoing labor dispute or attempted to regulate speech about union organizing. Those strike me as clear interferences with "substantive aspects of the bargaining process." Machinists, 427 U.S. at 149. I therefore believe that this issue turns on whether the Ordinance's more subtle effects on the bargaining process make it sufficiently akin to the regulations upheld in Metropolitan Life and Fort Halifax that it, too, can withstand preemption.

---

inheriting a unionized workforce under the Ordinance will be deemed a successor, I will not address that argument. Regarding the new employer's ability to engage in a lockout, the Ordinance expressly states that both employers and employees retain their rights to lockout and strike, respectively.

Because the NLRA is primarily concerned with establishing an equitable bargaining process and not with the substantive terms of the resulting bargain, Metro. Life, 471 U.S. at 753, states have some latitude to regulate the employment relationship pursuant to their police powers, id. at 756. The Supreme Court found in Metropolitan Life that the NLRA was meant to equalize the balance of bargaining power between employers and employees in an effort to increase wage rates and decrease the gap between wages and profits. Id. at 753-54. As the Court noted:

> The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement.

Id. at 754. Metropolitan Life stands for the principle that "[w]hen a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act." Id. at 757.

Unfortunately, the Supreme Court has not provided much guidance as to what distinguishes a minimum labor standard from an unconstitutional regulation of the collective bargaining or self-organization processes. The Court has simply suggested that a minimum labor standard "provides protections to individual union and nonunion workers alike, and thus 'neither encourage[s] nor discourage[s] the collective-bargaining processes that are the

subject of the NLRA.'"  Fort Halifax, 482 U.S. at 20-21 (quoting Metro. Life, 471 U.S. at 755).

The Ordinance's protections apply equally to unionized and non-unionized workers.  That neutrality does seem essential to the Ordinance's validity. Cal. Grocers, 254 P.3d at 1031 n.7.  The Ordinance does not tip the balance in favor of one category of workers, or force "employees to choose between exercising their right to enter a collective bargaining agreement and having their state-granted employment rights enforced," either of which might constitute an unlawful intrusion into the collective bargaining process.  Id.

Nor have Plaintiffs convinced me that the Ordinance otherwise encourages or discourages the collective bargaining process in a way that Congress did not countenance.  Certainly, when a state enacts a minimum labor standard, the state is at least marginally discouraging collective bargaining by incentivizing employers and employees to lobby the legislature, rather than negotiate with each other, to achieve their goals.  But Machinists does not seem to foreclose such a marginal impact on collective bargaining.  In Metropolitan Life, the Massachusetts law completely prevented any bargaining on the subject of minimum mental health benefits, but the Court found that mandated-benefit laws are "minimum standards independent of the collective-bargaining process that devolve on employees as individual workers, not as members of

a collective organization." Id. at 755 (citation and internal quotation marks omitted). Similarly, here, the Ordinance provides a benefit to workers in their individual capacities and not based on their membership in a union. Furthermore, as a practical matter, there would be no point in bargaining for the Ordinance's specific protections, because those protections are temporary in nature, and a collective bargaining agreement cannot bind a new employer without the new employer's assent. Howard Johnson Co. v. Detroit Local Joint Exec. Bd., 417 U.S. 249, 261 (1974).

The Ordinance does seem, at first glance, to encourage the collective bargaining process by providing unions with a three-month period in which to quickly organize retained workers, who will have an incentive to unionize because they could be about to lose their jobs. Because Plaintiffs did not make this argument, however, it is waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Furthermore, even if Plaintiffs had made the argument, I do not think it would succeed. To avoid having retained employees vote to unionize during the three-month period, I believe an employer need only give the employees a firm end date. Temporary employees whose departure date is definite are ineligible to vote in representation elections. See NLRB v. New England Lithographic Co., 589 F.2d 29, 32-34 (1st Cir. 1978). This "date certain" test is meant to promote the NLRB policy of including in representation elections only those employees who are "sufficiently

concerned with the terms and conditions of employment" to warrant their participation.  Id. at 34 (citation and internal quotation marks omitted).[28]  Thus, even if the Ordinance were to encourage collective bargaining in theory, I do not believe it will do so in practice.

Of course, the Ordinance is distinguishable from the law upheld in Metropolitan Life, which was intended to provide mental health treatment to less wealthy residents of the Commonwealth and which strikes me as falling more squarely within the state's power to promote public health and safety.  See Metro. Life, 471 U.S. at 756, 758.  And while the majority is correct that Plaintiffs have not helpfully distinguished the Ordinance from the mandatory severance law upheld in Fort Halifax, I can imagine some crucial distinctions.  For example, a mandatory severance law does not expose the employer to the possibility of having its workers unionize, file grievances, or file employment discrimination claims.  Nor does a mandatory severance law entail the same tax or insurance liabilities for the employer.

Nonetheless, in the final accounting, I believe that the Ordinance has at most a minimal impact on the collective bargaining process and is thus more comparable to the regulations upheld in

---

[28] The NLRB General Counsel in M&M Parkside took the position that incumbent employees retained during a 90-day retention period have "probationary or contingent" status.  2007 WL 313429.

Metropolitan Life and Fort Halifax than those struck down in Machinists, Golden State, and Brown. I therefore hesitantly conclude that the basic rule of Metropolitan Life applies here: a state or locality can regulate certain terms of the employment relationship, as long as the regulation affects union and non-union workers equally and does not substantively interfere with the self-organization or collective bargaining processes. 471 U.S. at 751-57.

### 3. Hiring and Firing

A minimum labor standard must not, however, be incompatible with the general goals of the NLRA. Id. at 757. The Supreme Court found in Machinists that Congress left certain conduct unregulated by the NLRA because it was meant "to be controlled by the free play of economic forces." 427 U.S. at 140 (citation and internal quotation marks omitted). Plaintiffs' third argument is that an employer's right to make hiring and firing decisions is part of that free zone. The majority repeatedly describes the Ordinance's impact on an employer's hiring ability as "limited." I respectfully disagree. The Ordinance imposes a workforce upon affected employers during the critical first three months of their business operations. Though an employer need only retain as many employees as are "necessary for its full operation," the employer must fill each of those positions with the predecessor's employees, whom the new employer played no role in

selecting.  After three months, should the new employer choose not to retain the predecessor's workers, it must replace those workers with other employees and train the new employees, which will undoubtedly cause upheaval.

The Ordinance's impact on an employer's ability to fire retained employees is similarly significant.  Though an employer can discharge retained employees during the three-month period, it can only do so for good cause, which functions as a very real restraint.  The majority dismisses this impact as speculative and limited, but it seems to me unquestionable that certain employers who would otherwise have hired employees under an at-will agreement will, under the Ordinance, inherit a workforce that can only be terminated for cause.  The three-month duration of the retention period will provide that employer with little comfort, as the employer will face potential challenges to any termination decisions it makes during the three-month period and will have to justify those decisions under the heightened good-cause standard.

Having recognized that the Ordinance's impact on an employer's ability to hire and fire is significant, however, I do agree with the majority that the NLRA does not seem to prohibit that impact.  In support of their argument, Plaintiffs rely on carefully-selected language from <u>NLRB</u> v. <u>Burns International Security Services</u>, 406 U.S. 272 (1972), <u>Howard Johnson</u>, and <u>Fall</u>

River Dyeing.[29]  In all three of those cases, however, the Supreme Court was addressing the need for a new employer to consciously take on successorship obligations, which we have determined are not at issue here.  None of those cases purported to address "whether a successor's hiring choices might be regulated or restricted by sources other than an existing collective bargaining agreement or federal common law."  Cal. Grocers, 254 P.3d at 1033.  Burns, Howard Johnson, and Fall River Dyeing establish that the NLRA does not require an employer to hire its predecessor's employees; those cases do not grant employers an unfettered right to hire and fire, immune from state or local regulation.  Thus, while Plaintiffs' argument is not without persuasive value,[30] I do not believe it is supported by existing jurisprudence.

---

[29] See Burns, 406 U.S. at 280 n.5 ("The Board has never held that the National Labor Relations Act itself requires that an employer who submits the winning bid for a service contract or who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be assumed by the employer."); Howard Johnson, 417 U.S. at 262 ("Clearly, Burns establishes that Howard Johnson had the right not to hire any of the [predecessor's] employees, if it so desired."); Fall River Dyeing, 482 U.S. at 40 ("[T]he successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring.")

[30] Indeed, it is the same argument made by the powerful dissenting opinions in Washington Service Contractors Coalition v. District of Columbia, 54 F.3d 811, 818-20 (D.C. Cir. 1995) (Sentelle, J., dissenting), and California Grocers, 254 P.3d at 1040-53 (Grimes, J., dissenting).

There is a general presumption against preemption, which is particularly strong here. See Fort Halifax, 482 U.S. at 21 ("[P]re-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State.") In that context, and considering the employee-focused nature of the NLRA, see NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 46 (1937), I do not believe we can infer that, where the successorship doctrine does not apply, Congress intended to leave the area of hiring and firing to be fully controlled by the free play of economic forces.

While I ultimately conclude that the Ordinance is a permissible exercise of the City's power to regulate the employment relationship and protect its workers, I find this to be a very close case. The Ordinance is not entirely on all fours with any of the regulations that the Supreme Court has upheld in its Machinists decisions. The case law gives us few clear rules to follow, leaving preemption somewhat in the eye of the beholder. Though I must agree with the majority that this particular regulation does not seem to be preempted by the Machinists doctrine under existing precedent, I do hope the Supreme Court will provide some guidance as to just how far a state or locality can go in the name of a "minimum labor standard."